**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ginger A. MILLER, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Toni A. HAMPTON, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jay L. NASH, Defendant–Appellant.**

**Nos. 91–1250, 91–1252 and 91–1768.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 10, 1992.

Decided Aug. 25, 1992.

Annette Krause, Joliet, Ill., argued, for defendant-appellant, Miller.

Carol A. Zuschek, Kansas City, Mo., argued, for defendant-appellant, Hampton.

J. Richard Lake, Holton, Kan., argued, for defendant-appellant, Nash.

E. Eugene Harrison, Kansas City, Mo., argued (Jean Paul Bradshaw II and Anita L. Mortimer, on the brief), for plaintiff-appellee, U.S.

Before McMILLIAN, LOKEN, and HANSEN, Circuit Judges.

LOKEN, Circuit Judge.

Ginger A. Miller, Toni A. Hampton, and Jay L. Nash appeal their convictions for conspiring to distribute cocaine and possessing cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. They claim an illegal airport search and seizure, insufficiency of the evidence, improper refusal to sever, errors in the admission of evidence, and prosecutorial misconduct. Concluding that the district court[1] correctly resolved each of these issues, we affirm.

I.

On February 15, 1990, Miller, Nash, and co-defendant John McMurray[2] arrived at the Ontario, California airport with three America West tickets for a late-night trip to Kansas City. They were interviewed by two Los Angeles police officers working narcotics interdiction. Nash then walked to the airplane, but left the airport; Miller and McMurray boarded the flight that began their journey to Kansas City International Airport. One of the Los Angeles officers telephoned DEA Special Agent Carl Hicks in Kansas City, alerted him to their suspicions, and briefed him concerning the interview in California.

Agent Hicks, Customs Agent Kantazar, and Platte County Detective Kessler arrived at the flight's gate area in the Kansas City airport at 5:30 A.M. The only person there, Ronnie Kirtdoll, watched the agents nervously and waved the next two to arrive—Hampton and Clifton Jones—to a different entrance, where the three men caucused until Kessler approached. When Kirtdoll returned to his seat in the gate area, Agent Hicks interviewed and detained him.

The America West flight then arrived. Before passengers deplaned McMurray's

---

1. The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

2. McMurray's appeal of his conviction was also submitted on February 10, 1992. However, we subsequently granted McMurray's motion to stay his appeal until the district court rules on his pending Rule 60(b) Motion to Vacate Judgment and Sentence.

brother arrived in the gate area, looked at Kirtdoll, and demanded to know what the officers were "doing to my Uncle Ronnie." A moment later McMurray and Miller emerged from the plane. After greeting McMurray's brother, Miller agreed to speak with Agent Hicks.

Hicks first asked to see Miller's ticket. As Miller opened her purse Agent Hicks could see a plane ticket on top; however, in an apparent stall for time, Miller reached her hand under the ticket and explored the depths of her purse while the McMurray brothers headed for the baggage carousel. Hicks asked Miller if she had checked a bag on the plane, and she said no. Hicks knew, however, that the California officers had seen a claim check for this flight in Miller's purse. Hicks directed Miller to sit down next to Kirtdoll, told her that he knew she had a baggage claim check, and asked her for it. Miller handed him a claim check.

Leaving Customs Agent Kantazar with Kirtdoll and Miller, Agent Hicks started toward the baggage carousel, but he doubled back after a few steps and handcuffed Kirtdoll and Miller. Hicks and Kessler then approached the carousel, where Hampton waited with the crowd that had gathered to claim luggage. Hicks retrieved the bag with the matching claim check number and carried it back to Miller in the gate area. When Agent Hicks asked if he could look in the bag for drugs, Miller said that he could do whatever he wanted because it was not her suitcase. Hicks then opened the bag and found just over 1300 grams of cocaine.

Miller was arrested and later confessed.[3] She was indicted and tried with Hampton, Nash, and McMurray on identical charges of cocaine conspiracy and possession with intent to distribute. The district court denied severance motions by Nash and Hampton but admitted only a redacted version of Miller's confession that eliminated all refer-

ences to her codefendants. The jury convicted the four on each count, but it acquitted a fifth defendant, Harry Christopher. These appeals followed.

## II.

*A. Fourth Amendment Issues.* Miller argues that the district court erred in denying her motion to suppress the cocaine Agent Hicks found in the checked bag. This issue turns upon the Fourth Amendment validity of Agent Hicks's detention of Miller in the gate area and his subsequent search of the checked bag.

(1) The parties agree that Miller was not seized for Fourth Amendment purposes until Hicks told her to sit with Kirtdoll while Hicks went to the baggage area to retrieve the checked bag. At that point, Miller argues that her detention in handcuffs in the gate area was an unlawful arrest that tainted Hicks's subsequent search of the bag. The government contends that Hicks detained Miller pursuant to a valid investigative stop and only arrested her after the cocaine was discovered.

■ Under well-settled Fourth Amendment case law, both investigative stops and arrests are "seizures," but an investigative stop must be supported by reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 25–31, 88 S.Ct. 1868, 1882–85, 20 L.Ed.2d 889 (1968). An investigative stop may become an arrest if it lasts for an unreasonably long time or the officers use unreasonable force in executing it. *See Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). We review such seizure questions de novo. *See United States v. McKines,* 933 F.2d 1412, 1426 (8th Cir.) (en banc), *cert. denied,* — U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991).

**3.** Miller told authorities that the cocaine belonged to Nash; that McMurray and Nash were in the business of selling cocaine in Topeka; that she had seen Nash convert powder cocaine to crack; and that Nash told her Hampton sold cocaine for him. Miller said that they had trav-

elled to California to buy a large amount of cocaine. McMurray had brought $10,000 in cash and Nash $8,000. Once in California, they discovered that they needed more cash and, after phone calls back to Topeka, Hampton had wired an additional $1000 to Nash.

There is no bright line of demarcation between investigative stops and arrests. *See United States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985); *United States v. Jones,* 759 F.2d 633, 636 (8th Cir.1985). During a *Terry* stop, officers may check for weapons and may take any additional steps "reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop," *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985), but they must employ the least intrusive means of detention reasonably necessary to achieve the *Terry* stop's purposes. *See Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Without disputing that Agent Hicks had reasonable suspicions, Miller argues that the use of handcuffs was excessive and turned a valid *Terry* stop into an unlawful arrest.

■ At the suppression hearing, Officer Hicks testified that he decided to handcuff Miller and Kirtdoll because the suspects in the vicinity outnumbered the officers by six to three, and because he doubted that Customs Agent Kantazar could effectively control two suspects while Hicks and Kessler went to the baggage claim area. The record supports these concerns. Agent Hicks's doubling back to handcuff Miller and Kirtdoll further suggests that his safety concerns were instinctive and sincere. Noting that Miller had lied about the claim check and that Hicks needed to act quickly to intercept the checked bag, the district court concluded that "handcuffing Miller was reasonable and was the least intrusive means available for Agent Hicks to safely maintain the status quo in order to achieve the purposes of the investigative detention, i.e., determine if there was probable cause to arrest any of the suspects for a drug offense."

After carefully reviewing the record, we agree. Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a *Terry* stop.[4] The nature of the crime Hicks suspected, drug trafficking, created a wholly credible concern that at least some of the suspects might be armed.[5] *See, e.g., United States v. Lyles,* 946 F.2d 78, 81 (8th Cir.1991). Given Hicks's legitimate concern for the safety of the officers, the need to detain Miller until the bag could be obtained, and the minimal time Miller spent in handcuffs before the cocaine was discovered, we will not second-guess Hicks's decision that this use of handcuffs was the least intrusive means reasonably necessary to achieve the purposes of his lawful investigative stop.

■ (2) Though Hicks was justified in seizing and detaining the checked bag, the *Terry* stop permitted him only "a limited investigation, *short of opening the luggage,* that would quickly confirm or dispel [his] suspicion." *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983) (emphasis added). The district court found, however, that Agent Hicks's opening and search of the bag did not implicate Miller's Fourth Amendment rights because she had abandoned it. We review this finding for clear error. *United States v. Ruiz,* 935 F.2d 982, 984 (8th Cir. 1991).

■ During the initial consensual phase of their encounter, Miller told Agent Hicks that she did not have a checked bag on the flight. After Miller handed over the claim check, Agent Hicks retrieved the bag and asked her if he could open it. Hicks testified at the suppression hearing, "She said I could do whatever I wanted to because it was not her suitcase," virtually the same words that were held to constitute a disclaimer or abandonment of the defendant's

---

4. *See, e.g., United States v. Laing,* 889 F.2d 281, 285 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1069, 110 S.Ct. 1790, 108 L.Ed.2d 792 (1990); *United States v. Crittendon,* 883 F.2d 326, 329 (4th Cir. 1989); *United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir.1989); *United States v. Glenna,* 878 F.2d 967, 971–73 (7th Cir.1989); *United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446, 447 (1983); *United States v. Purry,* 545 F.2d 217, 220 (D.C.Cir.1976).

5. A gun was in fact later found under the front seat of a car the suspects had parked at the airport.

shoulder bag in *United States v. Torres,* 949 F.2d 606, 607 (2d Cir.1991).

Miller argues that her abandonment was "vitiated" by her unlawful arrest. There are two obvious answers to this contention. First, Miller initially abandoned the bag during the consensual phase of the encounter, unequivocally disclaiming a privacy expectation in any checked bag. *See United States v. Frazier,* 936 F.2d 262, 265 (6th Cir.1991). Second, as we have explained, prior to Hicks's discovery of the cocaine, Miller was not under arrest. Hicks was acting pursuant to a valid *Terry* stop in retrieving the bag and obtaining a confirmation from Miller that she had abandoned it. An abandonment that occurs in response to proper police activity has not been coerced in violation of the Fourth Amendment. *See United States v. Willis,* 967 F.2d 1220 (8th Cir.1992).[6] Thus, the district court's finding that Miller had abandoned the bag when Agent Hicks opened it was not clearly erroneous.

■ *B. Sufficiency of the Evidence.* Miller and Hampton argue that the evidence presented at trial was insufficient to convict them of either conspiracy or possession with intent to distribute. In addition to her redacted confession, *see* page 958 *infra,* there was testimony that Miller was with McMurray and Nash at both airports. She looked to Nash for direction while responding to police questioning at the Ontario airport, she lied and stalled for time when questioned at the Kansas City airport, and she held in her possession, and attempted to hide, the claim check for a bag containing a large quantity of cocaine. Viewed in the light most favorable to the government, this was ample evidence from which the jury could find Miller guilty of both charges. *See United States v. Ivey,* 915 F.2d 380, 383–85 (8th Cir.1990).

■ Hampton's phone number was given to America West when Nash and McMurray purchased tickets for the plane trip to California to purchase cocaine. Hampton wired an additional $1000 to Nash in California, then denied to police that he had done so. Hampton was on the scene when the cocaine arrived at the Kansas City airport, where he and Jones heeded Kirtdoll's warning to enter by a different door and then held a whispered conference with Kirtdoll that broke up when Detective Kessler approached. Hampton later positioned himself near the baggage carousel and offered an inconsistent alibi that he came to meet a friend—for whom he had no address or phone number, and who never showed up.

While the government presented less evidence against Hampton than against Nash and Miller, we conclude that there was sufficient direct and circumstantial evidence for a rational jury to conclude that Hampton was a knowing participant in the conspiracy and, at a minimum, had aided and abetted the substantive drug violation. *See United States v. Mims,* 812 F.2d 1068, 1075 (8th Cir.1987) ("[o]nce a conspiracy is established, even slight evidence connecting the defendant to the conspiracy may be sufficient proof of his involvement"); *Ivey,* 915 F.2d at 384 (to convict of aiding and abetting, "the government must prove that the defendant had a 'purposeful attitude,' defined as affirmative participation which at least encourages the perpetrator").

*C. Severance.* Prior to trial, all defendants filed motions to sever based in large part upon the government's anticipated use of Miller's confession, which implicated them all. In response, the government presented the following redacted statement:

Miller stated that on February 13, 1990 she travelled to California. She stated that she travelled on an America West Airlines flight under the name of Claire Johnson through Las Vegas to Los Angeles. The flight number from Kansas City to Las Vegas was #757, and the flight number from Las Vegas to Los Angeles was #303. She stated that she

---

6. *See also United States v. Lewis,* 921 F.2d 1294, 1302 (D.C.Cir.1990); *United States v. McBean,* 861 F.2d 1570, 1574 (11th Cir.1988); *United States v. Veatch,* 674 F.2d 1217, 1219–21 (9th Cir.1981), *cert. denied* 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); *United States v. Berd,* 634 F.2d 979, 983, 987 (5th Cir.1981).

spent the first night in a Radisson Hotel and checked out of there about 12:30 p.m. She then went to Janet Kirtdoll's house in Pomona, California. She said she spent the night of February 14 at Kirtdoll's house. On the evening of February 15, she was driven to the Ontario, California airport. She was given airline tickets with a baggage receipt stapled to the folder for a bag which had already been checked with the airline. She travelled under the name of Ginger Helms and used an airline ticket issued to Ginger Helms to travel. She went from Ontario to Las Vegas on America West Flight # 780, then to Kansas City on Flight # 359 and arrived early on the morning of February 16, 1990.

Counsel for Miller agreed that this was a satisfactory redaction, and the court denied all motions to sever. At trial, the court denied renewed motions to sever and instructed the jury that it was to consider Miller's statement only in the case against her. Agent Hicks then testified to the substance of the redacted statement in a question and answer format. No defendant objected that this testimony departed from the above-quoted narrative. Miller did not testify in her own defense.

■ On appeal, Nash and Hampton argue that their motions to sever should have been granted because use of Miller's statement in the common trial violated their Confrontation Clause rights as defined in *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968). The district court denied the motions to sever, reasoning that use of the redacted statement, when accompanied by a limiting instruction, complied with *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). We review the district court's denial of severance for abuse of discretion. *See United States v. Stockton*, 968 F.2d 715 (8th Cir.1992).

■ Noting that *Bruton* carved a narrow exception to the broad presumption that jurors obey instructions to consider evidence only against a particular defendant, the Supreme Court in *Richardson* held that *Bruton* is not violated when a properly instructed jury hears a confession "redacted to eliminate not only the defendant[s'] name[s], but any reference to [their] existence." 481 U.S. at 211, 107 S.Ct. at 1709. Unlike the redaction in *United States v. Long*, 900 F.2d 1270 (8th Cir.1990), in which the defendant's name was replaced with a neutral pronoun, the redaction here cleansed Miller's statement of all reference to Hampton and Nash. Because the statement was redacted to the point that "linkage was necessary before any incriminating inference could be drawn," the redacted statement satisfied the *Richardson* standard. Therefore, the district court did not abuse its discretion in denying the motions to sever.

■ *D. The $18,000 Question.* Defense witness Brenda Washington, Nash's mother, testified that on February 14 she asked Hampton to wire $1,000 to Nash in California "to tie him over" until he contacted a cousin and to allow him to buy some bargain clothes for his younger brother. She was then asked on cross examination:

Q. You knew, of course, that between he and Mr. McMurray they had almost $18,000 when he went out there?

[NASH'S COUNSEL]: Objection.

A. I didn't know that. I don't know anything about that.

Nash and Hampton then moved for a mistrial, contending that the prosecutor's question improperly "bootlegged" before the jury an excluded portion of Miller's confession. The trial court denied the motions and then instructed the jury:

THE COURT: All right. Now members of the jury, please remember what I have told you before about the rule that lawyers' questions are not evidence unless the witness agrees with what a lawyer has said.

As you have just heard, the witness disagreed with Mr. Teschner [the prosecutor]. Therefore, Mr. Teschner's question should be completely disregarded by you and you may not use the question in any way in reaching a decision about this case.

The district court's ruling was not error, much less an abuse of discretion. The question was within the scope of Washington's direct testimony. Miller's statement provided the prosecutor with a good faith basis in fact for asking the question. Because the phrasing of the question did not suggest that Miller's unredacted statement was the source of the prosecutor's information, there was no violation of the district court's *Richardson/Bruton* ruling. *Compare United States v. Hernandez*, 779 F.2d 456, 459 (8th Cir.1985), where the prosecutor's remark was improper because it unmistakably identified the source of the information as an inadmissible conspirator's statement. Finally, even if the question had been improper, appellants did not warrant a mistrial because the witness answered the question emphatically in the negative and the jury received an extensive curative instruction.

■■■ *E. Nash's Prior Bad Act.* Nash argues that the district court improperly admitted evidence of his involvement in a cocaine transaction that occurred less than a month before the events in question. Evidence of prior bad acts is not admissible to prove character but may be admissible for other purposes, such as proving a defendant's motive to join a conspiracy, his intent to see it carried through, or his motive and intent to possess narcotics. *See* Fed. R.Evid. 404(b). After entertaining lengthy argument on the question, the district court found this prior act evidence relevant to the issues of motive and intent, similar in kind and close in time to the offense charged, and sufficient to support a jury finding that Nash committed the prior act. *See Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). The court also found this evidence more probative than prejudicial under Fed.R.Evid. 403. We agree.

■■■ Nash contends that evidence of the prior crime was inadmissible because he asserted a general denial defense and therefore motive and intent were not material issues in his case. We have consistently rejected this argument. *See United States v. Norton*, 846 F.2d 521, 524 (8th Cir.1988); *United States v. Burkett*, 821 F.2d 1306, 1309 (8th Cir.1987). As we explained in *United States v. Gilmore*, 730 F.2d 550, 554 (8th Cir.1984):

> By pleading not guilty, the defendant put the government to its proof on all elements of the charged crime, including intent, knowledge, and identity. The challenged testimony supports the government's position on each of these issues. The government is not required to wait until a defendant posits a particular defense asserting the lack of one of the elements of the charged crime, but may prove up their case in anticipation of such a defense.

*See also Estelle v. McGuire*, —— U.S. ——, ——, 112 S.Ct. 475, 481, 116 L.Ed.2d 385 (1991) ("the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense").

■■■ At one point during the lengthy colloquy on this question, counsel for Nash stated that "we can enter into some type of agreement with the government that when we do present our case we will not claim such a defense [of intent]." The Supreme Court recently granted certiorari in *Hadley v. United States*, —— U.S. ——, 112 S.Ct. 1261, 117 L.Ed.2d 491 (1991), a case which presents the question whether an offer to stipulate to the requisite criminal intent changes the 404(b) equation.

"As a general rule, the government is not bound by the defendant's offer to stipulate." *United States v. Peltier*, 585 F.2d 314, 324 (8th Cir.1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). In this case, we do not believe that Nash's ambiguous, last-minute suggestion of an agreement transformed the district court's otherwise appropriate 404(b) ruling into an abuse of discretion. At an earlier pretrial conference, Nash's counsel had announced that his defenses would include "lack of specific intent," and that "there are no stipulations, and there will be none." In these circumstances, bearing in mind that Rule 404(b) "is a rule of inclusion, rather than exclusion," *United States v.*

*Brown,* 956 F.2d 782, 786 (8th Cir.1992), the district court was well within its discretion in allowing the government to use this proper 404(b) evidence to prove these elements of its case.

Moreover, we agree with the government's contention that, if Nash had stipulated to the requisite motive and intent, the evidence of his participation in the conspiracy and in the substantive acts charged in the indictment was so overwhelming that the district court's admission of this prior acts evidence would have been harmless error. *See United States v. Nichols,* 808 F.2d 660, 663–64 (8th Cir.), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987).

*F. A Fifth Amendment Issue.* Miller and Hampton argue that the prosecutor violated their Fifth Amendment right not to testify when he remarked at the end of his rebuttal closing argument, "We can't force these people to take the stand. We can't torture them. That's unconstitutional." No defendant preserved this issue by making a contemporaneous objection during closing argument. The trial court had no opportunity to consider whether the remark was improper and, if so, whether the error could be cured by a cautionary instruction. Therefore, we will only review this contention under the plain error standard. *See United States v. Elem,* 845 F.2d 170, 173 (8th Cir.1988).

Although we think the remark was ill advised, we conclude that the district court did not commit plain error in failing *sua sponte* to declare a mistrial. As the Supreme Court commented in *Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974), "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."

The judgment of the district court is affirmed.