# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-4275

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the |
| v. | * | United States District Court |
| | * | for the District of Minnesota. |
| Edwin Martinez, Jr., also known as | * | |
| Edwin Martinez Franco, Jr., | * | |
| | * | |
| Appellant. | * | |
| | * | |

_____

Submitted: June 14, 2006
Filed: September 11, 2006

_____

Before LOKEN, Chief Judge, BEAM, and ARNOLD, Circuit Judges.

_____

BEAM, Circuit Judge.

Edwin Martinez, Jr. appeals his conviction, following a jury verdict, and sentence for bank robbery in violation of 18 U.S.C. sections 2113 (a) and (d). We affirm.

## I.   BACKGROUND

The Liberty Savings Bank in St. Cloud, Minnesota was robbed on July 23, 2004, at approximately 9:20 a.m.  The robber entered the bank, approached a teller, placed a gun on the counter in front of her, and told her this was a robbery.  The teller gave the man all the money she had in her drawer.  The man pulled his sleeves down over his hands, wiped down the counter with the sleeves, folded the bills in half, and put the wad of bills in one of his pockets.  He then slowly backed away, told the teller not to say anything, and left through the front door.

The bank contacted the police, and the teller described the robber to them as a black male in his early to mid-twenties, between 5'7" and 5'9" tall, wearing a gray hooded sweatshirt and blue jeans.  St. Cloud police officers Michael Lewandowski, Jeff Atkinson, and David Missell responded.  Atkinson was told to check the area surrounding the bank, and so went to a recreational area known as Lake George, about a half-mile from the bank.  Once there, he noticed a black male matching the height description, wearing a white tank top and blue pants, walking southbound very fast through the park.  Atkinson slowed his car to observe the man, Martinez, talking on his cell phone while walking.  Martinez looked up at Atkinson and quickly looked down again.  Atkinson noticed that Martinez's face was shiny and assumed he was sweaty.

Atkinson exited his car and told Martinez that he needed to talk with him.  Martinez cooperated, putting his hands behind his head.  Atkinson walked up to Martinez, took the cell phone from his hand and laid it on the ground, grabbed his hands, and told him that he was being detained because he matched the description of a bank robber.  Atkinson then performed a pat-down to check for weapons since the robber had used a gun.  At the same time Missell, who had responded to assist Atkinson, asked Martinez if he had any weapons on him.  Martinez responded that he possessed only a large sum of money.  Atkinson felt what he knew to be a wad of cash

-2-

in Martinez's pocket. At that point, Atkinson placed handcuffs on Martinez, and told him he would be further detained. Atkinson pulled the wad of cash partly out of the pocket to confirm it was money, and then pushed it back into the pocket. Missell then asked Martinez where he got the cash. Martinez responded that he had just been paid from his place of work. When Missell expressed disbelief, Martinez changed his story to say he saw a man running in the park, and that he found the money. Atkinson then placed Martinez in the back of the police car, read him his Miranda rights, and took him to the bank for a show-up identification.

Once at the bank, Atkinson placed Martinez on the sidewalk in front of the bank toward the windows, hands behind his back and cuffed. The teller was inside the bank. Upon seeing Martinez, she became physically shaken, and identified Martinez as the robber. He was then arrested and taken to jail.

Martinez was indicted on one count of bank robbery, in violation of 18 U.S.C. sections 2113 (a) and (d). Before trial, Martinez asked the magistrate judge to suppress (1) statements made in response to questioning from Missell about the wad of cash in his pocket because he was not given his Miranda warnings at that time, (2) the cash seized from his person after arrest because the officers lacked reasonable suspicion to conduct the Terry stop in the first place, and (3) the teller's identification of him at the bank as impermissibly suggestive. The magistrate judge denied all three requests in the report and recommendation, which was adopted by the district court.[1] Martinez was convicted and sentenced to 150 months imprisonment.

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota, adopting the report and recommendation of the Honorable Raymond L. Erickson, United States Magistrate Judge for the District of Minnesota.

## II.    DISCUSSION

### A.    Extent of <u>Terry</u> Stop

Martinez first argues that his statements to the officers in the park, the money seized from his person, and his participation in the show-up identification should be suppressed as "fruit of the poisonous tree" because once he was handcuffed and placed in the police car, the <u>Terry</u> stop turned into an arrest, for which officers had no probable cause. The parties both focus on whether the cuffing of Martinez constituted an arrest. We conclude that the cuffing did not convert the <u>Terry</u> stop into an arrest, and even if it did, the officers had probable cause to effectuate the arrest, based on the wad of cash discovered during the <u>Terry</u> frisk.

"An investigative detention may turn into an arrest if it 'lasts for an unreasonably long time or if officers use unreasonable force.'" <u>United States v. Maltais</u>, 403 F.3d 550, 556 (8th Cir. 2005) (quoting <u>United States v. Navarrete-Barron</u>, 192 F.3d 786, 790 (8th Cir.1999)). During an investigative stop, officers should use the least intrusive means of detention and investigation reasonably necessary to achieve the purpose of the detention. <u>Id.</u> During a <u>Terry</u> stop, officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the stop. <u>Id.</u> This court has previously held that use of handcuffs can be a reasonable precaution during a <u>Terry</u> stop to protect their safety and maintain the status quo. <u>See, e.g.</u> <u>United States v. Summe</u>, No. 05-4179, 2006 WL 1458293 (8th Cir. May 30, 2006) (unpublished) (holding that use of cuffs to detain suspected accomplice did not constitute arrest); <u>United States v. Saffeels</u>, 982 F.2d 1199, 1206 (8th Cir. 1992) (overruled on other grounds) (holding that using cuffs on robbery suspect did not convert <u>Terry</u> stop into arrest); <u>United States v. Miller</u>, 974 F.2d 953, 957 (8th Cir. 1992) (concluding that cuffing of suspects during <u>Terry</u> stop where suspects outnumbered officers and where officers

were concerned for safety was reasonably necessary to achieve purposes of Terry stop).

Here, the officers knew that the robbery had been accomplished by brandishing a gun. Martinez was a close match to the description of the robber, and Atkinson found him near the scene of the crime, acting suspiciously. The discovery of what Atkinson immediately recognized as a wad of cash on Martinez's person reasonably led Atkinson and Missell to believe that Martinez might be the robber, and that he might still have the gun used to commit the crime. Placing Martinez in handcuffs was a reasonable response to the situation in order to protect the officers' personal safety and to maintain the status quo. As such, the use of handcuffs did not convert this Terry stop into an arrest.

Martinez also argues that placing him in a patrol car and transporting him back to the bank made the stop an arrest. We do not agree. In United States v. Lego, 855 F.2d 542 (8th Cir. 1988), this court held that confining a potentially dangerous suspect to a patrol car while checking his identification was not tantamount to an arrest. There, the "obvious exigencies of the situation" authorized the officer to continue the Terry stop by confining the suspect to the patrol car "until the situation stabilized and she could determine if full custodial arrest and detention were warranted." Id. at 545. Here, the exigencies were such that the officers could not dispel their suspicions that had prompted the Terry stop until they transported Martinez back to the bank for the show-up identification. In United States v. Montano-Gudino, 309 F.3d 501, 504 (8th Cir. 2002), this court held that, given the circumstances, moving a suspect from one location to another did not exceed the bounds of Terry because it was reasonable to relocate the suspect for questioning.

In Hayes v. Florida, 470 U.S. 811 (1985), the Supreme Court held that transporting a suspect from his home to a police station for questioning goes beyond the scope of a Terry stop and effects an arrest for which there must be probable cause.

Here, the officers did not take Martinez to the police station during the <u>Terry</u> stop, but moved him only to the scene of the crime to help dispel or confirm their suspicions. Similarly, in <u>United States v. Charley</u>, 396 F.3d 1074, 1080 n.4, 1081 (9th Cir. 2005), the court, relying on <u>Montano-Gudino</u> and cases from seven other circuits, held that moving a suspect from the place officers found her to her own home in order to check on her children whom she may have harmed there did not effect an arrest. Thus, neither placing Martinez in the police car nor transporting him to the bank converted this <u>Terry</u> stop into an arrest for which probable cause was required.

Even if the stop could be considered an "arrest" following the cuffing of Martinez, the discovery of the wad of cash on his person provided probable cause to arrest him. <u>See, e.g.</u>, <u>United States v. Martin</u>, 706 F.2d 263, 265 (8th Cir. 1983) (finding that information officers obtained during investigatory stop "escalated the factual basis from one permitting an investigatory stop to one warranting an arrest"). Probable cause exists when, at the time of the arrest, "the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested." <u>United States v. Kelly</u>, 329 F.3d 624, 628 (8th Cir. 2003). Given the facts and circumstances known to Atkinson and Missell at the time they discovered the wad of cash, a reasonably cautious officer would believe that Martinez might well have committed the bank robbery, and thus probable cause existed to arrest him then.

### B. Nature of Questioning By Officers in Park

Martinez also argues that his statements to the officers in the park should be suppressed because they were made in response to custodial interrogation without the benefit of <u>Miranda</u> warnings. Whether Martinez was "in custody" for purposes of <u>Miranda</u> after being handcuffed during the <u>Terry</u> stop is a separate question from whether that handcuffing constituted an arrest for which probable cause was required.

Miranda warnings are required only where a person's freedom has been so restricted as to render him "in custody." United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004). The ultimate inquiry is whether (1) the person has been formally arrested, or (2) the person's freedom of movement has been restrained to a degree associated with a formal arrest. Id. "'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" Id. (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). "Thus, the critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way." Id. (internal quotation and citation omitted). "In answering this question, we look at the totality of the circumstances while keeping in mind that the determination is based on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Id. (internal quotation and citation omitted). See also United States v. Ollie, 442 F.3d 1135, 1137 (8th Cir. 2006).

In this case, Martinez was detained by two officers, patted down for weapons (with none being found), and closely questioned about his possession of weapons. Then, he was handcuffed and told he was being further detained. This occurred before being questioned by the two officers. A reasonable person would not, considering the totality of the circumstances, feel he was at liberty to stop the questioning and leave. Martinez's freedom was restricted to a degree often associated with formal arrest, and we find he was in custody at the time he was handcuffed. He was interrogated about the wad of cash while in this custody, being asked at least twice to explain the presence of the cash. Thus, we find that Martinez was subjected to custodial interrogation.

The government argues that so long as the encounter remained a Terry stop, no Miranda warnings were required. But the Supreme Court has indicated that the analysis is not that simple. In Berkemer v. McCarty, 468 U.S. 420 (1984), the Court looked to the *circumstances* involved in a traffic stop to conclude that the suspect's freedom of action was not "curtailed to a 'degree associated with formal arrest'" as to require Miranda warnings. Id. at 440 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)). In holding that the traffic stop at issue in Beheler was akin to a Terry stop, the Court held that, "by itself," the stop did not render him "'in custody.'" Id. at 441. Analyzing the factual circumstances, the Court noted that the "respondent has failed to demonstrate that, at any time between the initial stop and the arrest, he was subjected to restraints comparable to those associated with a formal arrest." Id. Thus, the Court looked not to the fact that the detention was a Terry stop, but rather to the circumstances bearing on the question of custody, just as we have done here. The Court noted that some traffic/Terry stops might involve such restraint, necessitating Miranda warnings. "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Id. at 440. Citing Berkemer, this court has previously implied the possible need for Miranda warnings during a Terry stop. "*[M]ost* Terry stops do not trigger the detainee's Miranda rights." United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003) (emphasis added). In this case, as we have said, Martinez was, under the circumstances, subjected to restraint associated with formal arrest, and was interrogated during that custody. Therefore, we follow the Supreme Court's cue and find that he was entitled to Miranda warnings at the time he was handcuffed. Since Miranda warnings were not given before Martinez gave conflicting accounts of how he got the wad of cash, those statements should have been suppressed.

Though failing to suppress the statements made in the park was error, we find it was harmless. "An error is harmless if it does not affect substantial rights of the defendant, and did not influence or had only a slight influence on the verdict." United

States v. Davis, 449 F.3d 842, 847 (8th Cir. 2006) (internal quotations and citations omitted).

Martinez argues that his contradictory explanations about the cash, the cash seized, and his participation in the show-up identification were all "fruit of the poisonous tree" under Wong Sun v. United States, 371 U.S. 471 (1963). However, we have found that handcuffing Martinez in the park did not convert the Terry stop into an arrest, and that even if it did, it was supported by probable cause. Thus, any arrest that might have allegedly occurred was not unlawful. Martinez has not shown that the police decided to take him to the bank for the show-up identification *because* he gave them contradictory statements. The Court in Wong Sun proceeded to a "fruit of the poisonous tree" analysis because "[t]he prosecutor candidly told the trial court that 'we wouldn't have found [the incriminating evidence] except that [the defendant] helped us to.'" Id. at 487. In this case, the record indicates that Atkinson was *instructed* to bring Martinez to the bank. We think, in this case, the identification of Martinez by the teller at the bank was obtained at least "by means sufficiently distinguishable" from, if not independent of, Martinez's non-Mirandized statements. Id. at 488. The cash retrieved from Martinez was fair game for seizure, as its discovery did not rely on his statements, and we have found that probable cause existed for his arrest at the time of its discovery. Thus, Martinez's "fruit of the poisonous tree" argument fails, and only his contradictory statements in the park should have been suppressed. Given the other admissible evidence against Martinez, we find that failure to suppress these statements did not sufficiently influence the jury to merit our reversal, and thus was harmless error.

## C.    The Show-Up Identification

Martinez argues that the introduction at trial of the results of the show-up identification violated his procedural due process rights because the procedure used was unduly suggestive and unreliable. "A crime victim's identification of the

defendant is admissible unless it is based upon a pretrial confrontation between the witness and the suspect that is both impermissibly suggestive *and* unreliable." United States v. King, 148 F.3d 968, 970 (8th Cir. 1998) (internal quotation omitted). "An identification is unreliable if its circumstances create 'a very substantial likelihood of irreparable misidentification.'" Id. (quoting Brodnicki v. City of Omaha, 75 F.3d 1261, 1265 (8th Cir. 1996)). "Police officers need not limit themselves to station house line-ups when an opportunity for a quick, on-the-scene identification arises. Such identifications are essential to free innocent suspects and to inform the police if further investigation is necessary." Id. "'[A]bsent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations.'" Id. (quoting Russell v. United States, 408 F.2d 1280, 1284 (D.C.Cir.1969)) (alteration in original).

Though Martinez argues that the show-up was unduly suggestive because he was handcuffed, he had been driven to the bank in a police car, and because police officers were present, "[n]ecessary incidents of on-the-scene identifications, such as the suspect[] being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive." Id. "Whether such factors cast doubt on the accuracy of a positive identification is an issue for the jury." Id. Given the facts in this case, we do not believe the show-up identification was unduly suggestive. Even if it was, we do not find that the circumstances created "'a very substantial likelihood of irreparable misidentification'" because the teller's identification was reliable. Id. (quoting Brodnicki v. City of Omaha, 75 F.3d 1261, 1265 (8th Cir. 1996)). "Given [the teller's] opportunity to clearly observe the robber[], [her] direct dealing with him at the time of the offense, [her] prior description of the robber[], the certainty of his identification, and the short time between the robbery and his identification," the show-up identification was reliable. United States v. Woody, 690 F.2d 678, 680 (8th Cir. 1982) (holding that the show-up identification was reliable in spite of being unduly suggestive, and thus permissible). Therefore, admission at trial of the results of the show-up identification, as well as the subsequent identification of Martinez by

the teller at trial, did not violate Martinez's procedural due process rights. <u>King</u>, 148 F.3d at 970.

## III.  CONCLUSION

Finding no other non-frivolous issues, we affirm.

LOKEN, Chief Judge, dissenting in part and concurring in the judgment.

I respectfully dissent from the conclusion in Part II.B. of the court's opinion that Officer David Missell violated Edwin Martinez's Fifth Amendment rights by failing to give <u>Miranda</u> warnings before asking Martinez to explain the "wad of cash" found in his pocket shortly after an armed bank robbery.  I agree that the district court's suppression error, if any, was harmless, and with the remainder of the court's opinion.  Therefore, I concur in the decision to affirm.

<u>Miranda</u> warnings are required before the police engage in "custodial interrogation," which the Supreme Court defined in <u>Miranda</u> as whenever "a person has been taken into custody or otherwise deprived of his freedom of action *in any significant way*."  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966) (emphasis added). Later, the Court decided in <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968), and cases applying <u>Terry</u>, that the Fourth Amendment is not violated when a police officer with reasonable suspicion that criminal activity is afoot briefly detains (seizes) a suspect while making a reasonable investigation to confirm or dispel the officer's suspicion. The investigation normally includes brief questioning "reasonably related in scope to the justification" for the stop.  <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 881 (1975).  The apparent overlap of the broad definition of custody in <u>Miranda</u> and the detention inherent in a <u>Terry</u> stop inevitably raised the question whether a <u>Terry</u> stop is a significant deprivation of the suspect's freedom of action so that <u>Miranda</u> warnings are required before any questioning.  An affirmative answer to this question

would have undermined both the practical and the constitutional underpinnings of the Court's 8-1 decision in <u>Terry</u>: "if the investigative stop is sustainable at all, constitutional rights are not necessarily violated if pertinent questions are asked and the person is restrained briefly in the process." 392 U.S. at 35 (White, J., concurring).

Not surprisingly, the Court declined to make <u>Miranda</u> warnings mandatory during <u>Terry</u> stops. In <u>Berkemer v. McCarty</u>, 468 U.S. 420, 441 (1984), the Court held that a motorist stopped and questioned for a routine traffic offense was not in custody for <u>Miranda</u> purposes until he was later arrested for driving while intoxicated. In explaining its decision, the Court expressly equated traffic stops and <u>Terry</u> stops and observed that the nonthreatening and noncoercive nature of both "explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda." Then, reiterating the test it had articulated in post-<u>Miranda</u> cases, the Court cautioned that <u>Miranda</u> warnings are required if, at any point during a <u>Terry</u> stop, "a suspect's freedom of action is curtailed to a degree associated with formal arrest." <u>Berkemer</u>, 468 U.S. at 440. The Court acknowledged that "the doctrine just recounted will mean that the police and lower courts will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody [for <u>Miranda</u> purposes]." <u>Id.</u> at 441. We have construed <u>Berkemer</u> to mean that "most <u>Terry</u> stops do not trigger the detainee's <u>Miranda</u> rights." <u>United States v. Pelayo-Ruelas</u>, 345 F.3d 589, 592 (8th Cir. 2003). But this is one of those difficult cases.

In my view, the court's opinion errs by relying heavily on two station-house questioning cases -- <u>United States v. LeBrun</u> 363 F.3d 715 (8th Cir. 2004), and <u>Thompson v. Keohane</u>, 516 U.S. 99 (1995). In such cases, the dominant inquiry is whether a suspect *who agreed to be questioned* was still free to leave when he made incriminating statements. By contrast, during a <u>Terry</u> non-consensual stop, "[o]ne is not free to leave . . . until the completion of a reasonably brief investigation, which may include limited questioning." <u>Pelayo-Ruelas</u>, 345 F.3d at 592. Thus, it is contrary to <u>Berkemer</u> for the court to frame the <u>Miranda</u> custody question as being

-12-

whether a reasonable person would "feel he was at liberty to stop the questioning and leave," supra at p.7, because that framing compels the conclusion that all questioning during lawful Terry stops must be preceded by Miranda warnings.

Applying Terry, the court concludes -- correctly, in my view -- that Officers Missell and Jeff Atkinson acted reasonably when they stopped Martinez, a bank robbery suspect; frisked and handcuffed him in the interest of officer safety and to prevent flight; took a quick look at a wad of cash in his pants that might be contraband; did not seize the cash; placed Martinez in the patrol car and gave him Miranda warnings; and then took him some distance for a show-up before the bank teller victim. In the midst of this relatively coercive Terry stop, justified by the violent crime that had just occurred, Missell asked Martinez to explain how a suspicious wad of cash came to be in his pocket soon after an armed bank robbery.

In my view, the critical fact for Miranda purposes is that the questions were entirely consistent with the proper scope and purpose of a reasonable Terry stop. To be sure, handcuffing is an additional restraint on the suspect's freedom of action, a restraint that often accompanies formal arrests. But in a Terry stop, handcuffing may signal that a formal arrest is imminent, or it may be an action reasonably limited to officer safety concerns or the risk of flight while the officers attempt to quickly confirm or dispel their suspicions. In distinguishing the two situations, I consider the nature of the questioning critical. If Missell had interrogated the handcuffed Martinez about his actions earlier that day, or the details of the robbery, or other crimes under investigation, that would be custodial interrogation consistent with a formal arrest, and Miranda warnings would be required. But brief questioning consistent with the limited purpose of the Terry stop did not require such warnings, even though the suspect was (reasonably) handcuffed. This distinction is consistent with cases holding that a Terry stop that includes handcuffing followed by brief questioning related to the purpose of the stop does not violate the suspect's Fourth or Fifth Amendment rights. See United States v. Cervantes-Flores, 421 F.3d 825, 829-30 (9th Cir. 2005), cert. denied, 126 S. Ct. 1911 (2006); United States v. Fornia-Castillo, 408 F.3d 52, 63-65

-13-

(1st Cir. 2005); <u>United States v. Miller</u>, 974 F.2d 953, 956-57 (8th Cir. 1992); <u>United States v. Bautista</u>, 684 F.2d 1286, 1292 (9th Cir. 1982), <u>cert. denied</u>, 459 U.S. 1211 (1983).  The court cites no factually similar case to the contrary.

"Fidelity to the doctrine announced in <u>Miranda</u> requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated."  <u>Berkemer</u>, 468 U.S. at 437.  I conclude that Martinez was not in custody for <u>Miranda</u> purposes when he gave inconsistent and therefore incriminating answers to questions that were consistent with a lawful <u>Terry</u> stop.

_____