# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-2743
_____

United States of America

*Plaintiff - Appellee*

v.

Victor Lee Childers

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: May 11, 2023
Filed: July 18, 2023
_____

Before SMITH, Chief Judge, COLLOTON and BENTON, Circuit Judges.
_____

SMITH, Chief Judge.

Victor Childers conditionally pleaded guilty to being a felon in possession of a firearm and ammunition. His conditional plea preserved his right to appeal the denial of his motion to suppress the ammunition recovered from his person and the

firearms recovered from his vehicle. Childers appeals the district court's[1] denial of his motion to suppress on these preserved issues. We affirm.

## I. *Factual Background*

One early Saturday morning in July 2020, police received a 911 call reporting gunfire near Riverfront Park, an isolated, wooded area along the Minnesota River in Burnsville, Minnesota. The call reported that three males, two described as black and one as "lighter-skinned," were shooting into the river. R. Doc. 37, at 8. A separate report described the "white male" as in his late twenties and wearing a black shirt. *Id.* at 7. Police were dispatched to the Riverfront Park area to investigate the potential violation. *See* Minn. Stat. § 609.66, subd. 1a(a)(3) (providing that reckless discharge of a firearm within a municipality is a felony); R. Doc. 37, at 10 (testifying that a city ordinance bars firearms within Riverfront Park). The officers sought to find the individuals and investigate the gunshots. They planned to perform a temporary stop that would include a pat-down check for firearms for safety concerns. At the suppression hearing, officers who knew the area testified that Riverfront Park was typically not very busy on Saturday mornings, and they anticipated being able to find the group of persons seen in the area.

Upon arrival, an officer noticed three individuals matching the description given in the 911 reports. The three men were leaving a wooded area and walking toward a parked vehicle. Officers approached the trio—comprised of two black men and Victor Childers, who is white. Childers was wearing a black shirt. The men entered a silver car parked in the lot. Officers then followed protocol for a "high-risk felony stop." *Id.* at 31. Burnsville officers use this protocol when they believe firearms are involved and may pose a risk to officer or bystander safety. Using this

---

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

protocol, the officers approached the vehicle with guns drawn and ordered the men out of the vehicle one by one.[2]

Childers sat in the driver's seat. He opened the door and asked officers why he was being stopped. After an officer explained the 911 call, Childers exited the vehicle and was handcuffed. The other two occupants were removed from the vehicle and secured as well, following the protocol. After handcuffing the three men, the officers placed them in separate vehicles.

Next, an officer informed Childers that he was going to pat him down. After beginning the pat-down search, the officer paused at Childers's front-right pocket, having felt what he believed were bullets. He emptied the pocket, discovering a cell phone and a bandana wrapped around metallic objects. The officer asked Childers if anything illegal was inside the bandana. Childers responded, "we just found this." *Id*. at 53. Childers then admitted that the contents of the bandana were bullets but explained that he and his companions found the bullets.

Based on the 911 calls reporting gunshots and the discovery of ammunition in Childers's pocket, the officers expected that the vehicle contained a firearm. Concerned for their safety and the public's, the officers conducted a protective sweep of the car. Within about two minutes, officers located the first of two handguns under the driver's seat where Childers had been sitting. Childers was arrested and charged by indictment with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). He pleaded guilty, reserving the right to challenge the validity of the officers's search of the vehicle.

---

[2]These events were captured on body camera footage and entered into evidence. *See id.* at 61 (citing Gov't's Ex. 3.)

## II. *Discussion*

Childers argues on appeal that (1) the high-risk felony stop protocol transformed an investigative stop pursuant to reasonable suspicion, or *Terry*[3] stop, into a de facto arrest without probable cause; (2) the search of his person "exceeded the permissible scope and intensity" of a valid *Terry* stop; and (3) the search of the vehicle exceeded the scope of the protective sweep doctrine. Appellant's Br. at 18. The government responds that (1) use of the protocol was necessary to protect public safety and justified by the circumstances; (2) the officer immediately recognized the items as ammunition and so seized them as part of a lawful *Terry* stop; and (3) the search of the vehicle was a lawful protective sweep, and, in the alternative, was supported by probable cause following the discovery of the bullets. The district court concluded that the officers lawfully stopped the vehicle and searched Childers's person and the vehicle. We review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Parker*, 993 F.3d 595, 601 (8th Cir. 2021).

### A. *Whether the Stop Transformed Into An Arrest*

Our circuit considers five principal factors in determining whether a *Terry* stop has transformed into an arrest:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

---

[3]*Terry v. Ohio*, 392 U.S. 1 (1968).

*United States v. Johnson*, 31 F.4th 618, 623 (8th Cir. 2022) (quoting *Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021)). Analysis of these factors disfavor concluding that this *Terry* stop transformed into an arrest.

The first and second factors weigh in favor of the government. The district court found that about seven police officers arrived on the scene in three separate vehicles. This number of officers did not display an excessive police presence given that an illegal firearm discharge had been reported involving three individuals in a public park. The nature of the suspected crime elevated police concerns for the safety of the public and themselves. It was reasonable to believe that the persons they identified and approached might be armed and had recently unlawfully discharged a firearm. Thus, both factors justified a greater show of force in performing the *Terry* stop.

The third factor also weighs in favor of the government. The officers were responding to a 911 call from an identified eyewitness. The identified eyewitness reported potentially felonious behavior involving a firearm. The eyewitness described the group of three individuals with a reasonable degree of particularity: two black males and one white male; the white male was wearing a black shirt and was described as being in his late twenties. Given the small number of patrons in the park at that time, a call describing this group of three males in an isolated area would likely serve to winnow the potential persons of interest. Childers and his companions fit this description.

The fourth factor favors neither the officers nor Childers to any meaningful degree. The officers' body camera recordings confirm that Childers complied with the officers' commands. Childers appeared to initially talk back to the officers but did not behave disorderly or disobey their commands. The video showed that the officers could not readily observe the vehicle's occupants and thus reasonably directed them

to exit it. Keeping the occupants separated was also reasonable because their actions prior to exiting the vehicle could not be observed.

The fifth factor also weighs in the government's favor. The officers observed the trio exiting the woods and entering a vehicle. The officers then stopped the vehicle as it was about to leave the parking lot. Given the "obvious exigencies of the situation" the officers were "authorized . . . to continue the *Terry* stop by confining the suspect[s] to the patrol car 'until the situation stabilized and [they] could determine if full custodial arrest and detention were warranted.'" *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006) (quoting *United States v. Lego*, 855 F.2d 542, 545 (8th Cir. 1988)). Based on our analysis of these five factors, we conclude that the officers' actions did not convert the valid *Terry* stop into an arrest. And, despite Childers's argument to the contrary, our precedent counsels the same.

When an officer has reason to believe a suspect is armed, we have held that drawing a firearm and handcuffing the suspect does not automatically transform an investigatory stop into an arrest under *Terry v. Johnson*, 31 F.4th at 623 (citing five cases that each held that drawing weapons and handcuffing a suspect was appropriate where officers had reason to believe suspect may be armed). The key point of inquiry is the reasonableness of the officers' belief that the subject of the stop is armed. *See Pollreis*, 9 F.4th at 745–46 (distinguishing *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011), a case where there were no exigent circumstances and the officer neither had reason to believe the suspect was armed nor observed suspicious behavior by the suspect).

Similarly, placing suspects in squad cars does not transform a stop into an arrest where the situation warrants the action. *See Martinez*, 462 F.3d at 908 (holding that placing a suspected bank robber, who was believed to be armed, in a squad car and returning him to the scene of the crime for identification was not an arrest); *Lego*,

855 F.2d at 545 (holding no arrest where suspect was placed into a squad car so officers could check his identification after discovering he was armed with a knife).

Here, the officers had at least a reasonable suspicion that at least one of the suspects was armed or that a firearm was in the vehicle. The officers' actions warranted placing Childers in a separate secure location. Therefore, applying our precedent to the instant facts, we conclude that the officers' methods were permissible and did not transform the *Terry* stop into an arrest. The district court did not err in so concluding.

B. *Whether the Search of Childers's Person Was Permissible*

"Under *Terry*, a law enforcement officer may conduct a warrantless pat-down search for the protection of himself or others nearby in order to discover weapons if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous." *United States v. Muhammad*, 604 F.3d 1022, 1026 (8th Cir. 2010) (internal quotation marks omitted). "A police officer lawfully patting down a suspect's outer clothing may seize any object whose contour or mass makes its identity immediately apparent as incriminating evidence." *United States v. Cowan*, 674 F.3d 947, 953 (8th Cir. 2012) (cleaned up).

> [A]n item's incriminatory nature is immediately apparent if the officer at that moment had probable cause to associate the property with criminal activity, meaning the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be . . . useful as evidence of a crime.

*Id.* (cleaned up).

The officer testified that he immediately identified the items in Childers's pocket as bullets. The district court believed him. This conclusion was not clearly erroneous. Having identified the items as bullets, the officer was permitted to

immediately seize them believing the bullets were "useful as evidence of a crime." *Id*. (internal quotation marks omitted). The bullets provided evidence of the crime the officers were investigating—reckless discharge of a firearm. As such, they could be lawfully seized.

### C. *Whether the Search of Childers's Vehicle Was Permissible*

Childers argues that the search of his vehicle was not justifiable under the protective sweep doctrine. We need not address this argument. Upon lawful discovery and seizure of the bullets from Childers's person, the officers had probable cause to believe that Childers had committed a felony involving a firearm. Probable cause that the vehicle contained evidence of criminal activity—here, the firearm used in the reckless discharge—"has long been held to justify a warrantless search of the automobile and seizure of the contraband." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016). It is thus unnecessary to determine if the search satisfied the requirements for a protective sweep.

### III. *Conclusion*

We affirm.

_____