# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1752

_____

United States of America,

    Plaintiff - Appellee,

    v.

John Williams Powell Mayo,

    Defendant - Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

_____

No. 10-1857

_____

Appeals from the United States
District Court for the Northern
District of Iowa.

United States of America,

    Plaintiff - Appellee,

    v.

Ryan Matthew Braiske,

    Defendant - Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

_____

Submitted: November 19, 2010
Filed: December 13, 2010

_____

Before MURPHY, SMITH, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Ryan Braiske and John Mayo were charged with possession with intent to distribute and aiding and abetting the possession with intent to distribute MDMA under 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2. After Braiske and Mayo entered conditional guilty pleas, the district court[1] denied their suppression motions. Braiske was sentenced to 140 months and Mayo to 87 months in prison. Both men appeal the denial of their suppression motions. We affirm.

I.

In September 2009, trooper Nathan Andrews stopped the minivan Braiske was driving after observing the driver not wearing a seatbelt. When Andrews asked for Braiske's license and registration, Braiske handed him an Illinois identification card and a blank vehicle registration. Andrews observed that Braiske's hands were shaking. He also noted that the passenger, later identified as Mayo, was breathing heavily with a visible pulse in his neck and avoiding eye contact. At the suppression hearing Andrews testified that the minivan had the "lived-in look," an indicator of the "hard travel" common to drug couriers who drive for long periods without stopping.

Braiske accompanied Andrews to the patrol car while he completed the seatbelt citation. While Braiske was in the car, Andrews questioned him about his destination, about Mayo, and about his criminal history. Braiske admitted he had a prior drug conviction and explained that he was returning from Colorado to Illinois where he lived. He stated that he had been visiting Colorado with Mayo for a couple of weeks,

_____

[1] The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

-2-

and that Mayo would be returning to Virginia after stopping in Chicago. Andrews observed that Braiske's hand continued to shake, that he had an elevated pulse rate, and that his face was breaking out in red blotches.

Andrews found Braiske's explanations implausible so he proceeded to speak with Mayo. Mayo told him that he had started his trip in Virginia, driven to Braiske's girlfriend's house in Chicago and left his car there, and then gone to Colorado in the minivan. Mayo further explained that the two stayed at a hotel in Colorado for four days and that they were now returning to Chicago, where Mayo would retrieve his vehicle and return to Virginia. During this time Andrews observed that Mayo's breathing was labored, his pulse was elevated and visible in his neck, and that beads of sweat were forming on his forehead. Mayo continued to avoid eye contact.

Andrews went back to his patrol vehicle and finished issuing Braiske's citation about thirty minutes into the stop. He instructed Braiske to be careful pulling out onto the highway, and then proceeded to ask Braiske for consent to search the minivan. This exchange, recorded by the patrol car's video camera, included:

> Q. Can I search your car?
> A. I mean, I'd prefer not, but. . . .
> Q. I'm going to ask you again, it's a "yes" or "no," okay?
> A. Well, no.
> Q. No, okay. Would you mind waiting for a canine to come here and do a sniff around the vehicle, would that be okay with you?
> A. I mean, you can search it, but, I mean, I'm already out the door . . . .
> Q. I understand you're out the door, that's why I'm asking you.
> A. I mean, yeah, well you can run through it real quick, I don't care.
> Q. Okay. Let's just be real clear about this: do you have any drugs in that vehicle?

A.   I have nothing in there.  I mean, I do have a knife, but it's not. . . . I don't think it's illegal. It's a bulldog knife, and it's right in the door.

Q.   Okay, again, can I search the car?

A.   Go ahead, I don't care.

Q.   Is that a yes?

A.   Yes, go ahead.

Andrews left Braiske in the patrol car and approached the minivan where Mayo was sitting.  As Andrews walked up to the van, he observed on the ground outside the passenger door a "one inch by one inch little Ziploc bindle with little devil heads on it," which he recognized to be consistent with drug packaging.  After picking up the bindle, Andrews looked at Mayo.  Andrews testified that Mayo's nervousness "was so heightened [he] actually had to ask him if he was going to have a heart attack or [was] having a heart attack."  Andrews testified that Mayo's "condition was in demise," and that he was "very, very nervous."  At that moment Andrews also noticed an identical bindle on the floorboard of the minivan between Mayo's feet. When Andrews asked Mayo whether he had seen the bindle before, Mayo's "face just went blank."  Mayo denied ever seeing the bindle before, as did Braiske when he was later questioned about it.

Andrews and other troopers who had arrived on the scene began searching the minivan.  Among other items, troopers found a screwdriver and a magazine about growing marijuana in a rear storage compartment.  Andrews used the screwdriver to pull back paneling on the rear hatch of the minivan and noticed that a plastic covering in the void behind the panel had been disturbed, suggesting that the panels had been previously accessed.  Troopers then pulled back the paneling on the passenger side door and saw duct tape in the interior portion of the door.  After removing the duct tape, they discovered two packages containing white powder.  They also discovered four additional packages inside the driver's side door.  Lab testing later revealed that all six packages contained MDMA, commonly known as ecstacy.

-4-

After the government charged Braiske and Mayo with possession of the drug with intent to distribute and aiding and abetting such possession, both defendants moved to suppress the evidence seized in the minivan. Braiske argued that the Iowa troopers had exceeded the scope of his consent to search when they began pulling back the door panels and that by keeping him in the patrol car during the search the troopers denied him the opportunity to withdraw his consent. Mayo incorporated these arguments by reference and also asserted that he had standing as a passenger to challenge the constitutionality of the search and seizure.

The district court rejected the defendants' arguments. It concluded that trooper Andrews acted within the scope of Braiske's consent because it was reasonable to search areas of the minivan where drugs could be hidden as long as the search was conducted in a "minimally intrusive manner." It further held that Braiske was not deprived of an opportunity to revoke his consent because he was in a position to communicate with officers but never tried to do so. Finally, it upheld the magistrate judge's alternative holding that under the automobile exception the troopers had probable cause to believe the minivan contained drugs based on the defendants' nervous behavior, their inconsistent stories, Braiske's criminal history, and the discovery of the bindles with markings consistent with drug packaging.

Both Braiske and Mayo appeal the district court's denial of their suppression motions and argue that trooper Andrews's actions violated their Fourth Amendment rights. In No. 10-1752, Mayo argues that (1) trooper Andrews unreasonably detained them for thirty minutes before issuing the seatbelt citation; (2) Braiske's consent to search the minivan was not voluntary; and (3) Andrews's search of the minivan exceeded the scope of Braiske's consent. In No. 10-1857, Braiske joins Mayo in arguing that trooper Andrews's search exceeded the scope of his consent, and also argues that (4) Andrews lacked probable cause to believe the minivan contained drugs at the time he searched it.

-5-

II.

We first address the district court's holding that Andrews had probable cause to believe drugs would be found in the vehicle when he searched it.[2] On this issue the Eighth Circuit reviews a district court's factual findings for clear error and its legal conclusions de novo. United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000) (per curiam). "As long as the law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception." Id. Probable cause exists "when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id.

The magistrate judge identified several "suspicious circumstances" giving the troopers probable cause to believe drug contraband would be found in the minivan: (1) Braiske's signs of nervousness, including shaking hands, labored breathing, a visible pulse in his neck, and the development of red blotches on his face; (2) Mayo's extreme nervousness, including heavy breathing, sweating, a visible pulse in his neck, and avoidance of eye contact; (3) Braiske and Mayo's contradictory statements about their travel history; (4) Braiske's significant criminal history of drug related offenses; and (5) trooper Andrews's discovery of two bindles consistent with drug packaging in plain view. The district court agreed and concluded that "the items recovered during the search are admissible under the automobile exception."

On appeal, Braiske argues that these facts are only sufficient "to justify a prolonged traffic stop or investigatory seizure" and do not rise to the level of probable cause. He suggests that Andrews's discovery of the drug bindles makes the question

---

[2] Mayo has not expressly challenged the district court's holding on this issue.

close, but that this case lies "somewhere on the continuum between Terry-level suspicion and full blown probable cause to arrest."

We agree with the district court that trooper Andrews had probable cause to believe drug contraband would be found in the minivan when he searched it. We have often held on similar facts that law enforcement officials had probable cause to search vehicles under the automobile exception. See, e.g., United States v. Hill, 386 F.3d 855, 858 (8th Cir. 2004) (police had probable cause to search the defendant's vehicle given his "nervous behavior, his warrant for a controlled substance crime, his reputation for engaging in drug activity" and most importantly, a drug dog's alert); United States v. Rowland, 341 F.3d 774, 785 (8th Cir.) (discovery of drug paraphernalia during a Terry frisk was "sufficient to create probable cause to search the entire vehicle"), cert. denied, 540 U.S. 1093 (2003); Fladten, 230 F.3d at 1086 (police had probable cause to search the defendant's vehicle when the vehicle was parked in the driveway of a house in which agents had found evidence of drug activity, and an "item commonly used in the manufacture of [drugs] was in plain view" in the car's back seat). Likewise here, we think a reasonable person could believe there would be a fair probability of finding drugs in the minivan based on the defendants' nervous behavior, their inconsistent stories, Braiske's drug history, the discovery of the drug bindles, and the "lived-in" look of the minivan.

Contrary to Braiske's assertions, the facts of this case are stronger than cases in which the court has upheld reasonable suspicion determinations. Compare United States v. Sanchez, 417 F.3d 971, 975–76 (8th Cir. 2005) (officer had reasonable suspicion to expand traffic stop after observing the defendant's "increasingly nervous behavior," defendant provided false identification, and two defendants provided "conflicting stories"); United States v. Lebrun, 261 F.3d 731, 733 (8th Cir. 2001) (officer had reasonable suspicion based on defendants' "unusually nervous" behavior, their "vague and confused" answers, and the officer's observation of food and drink wrappers in the car consistent with his training about practices common to drug

traffickers). This case has all of the markings that established reasonable suspicion under <u>Sanchez</u> and <u>Lebrun</u>, with the significant additional facts of Braiske's drug history and the discovery in plain view of the bindles with the drug markings. In <u>Fladten</u>, "[t]hese facts provided a substantial basis for the conclusion that further contraband or evidence may have been in other parts of the automobile," 230 F.3d at 1086. Accordingly, we conclude that the officers' warrantless search of the minivan did not violate either Braiske's or Mayo's Fourth Amendment rights.

III.

Mayo and Braiske also argue that the district court erred in finding that the search of the minivan's door panels was within the scope of his consent. "The clearly erroneous standard governs our review of this issue." <u>United States v. Martel-Martines</u>, 988 F.2d 855, 858 (8th Cir. 1993), citing <u>United States v. McKines</u>, 933 F.2d 1412, 1424 (8th Cir.) (en banc), <u>cert. denied</u>, 502 U.S. 985 (1991). This court measures the scope of consent by a "standard of objective reasonableness"—what the "typical reasonable person [would] have understood by the exchange between the officer and the suspect." <u>United States v. Siwek</u>, 453 F.3d 1079, 1085 (8th Cir. 2006), quoting <u>Florida v. Jimeno</u>, 500 U.S. 245, 251 (1991).

The magistrate judge concluded that, "by voluntarily giving his consent to search the minivan, Braiske authorized Trooper Andrews to search for the items Trooper Andrews had questioned him about—guns, knives, explosives, large amounts of money, and drugs." The magistrate judge further found that it was objectively reasonable for Andrews to search "any part of the [minivan] where these items might be stored," including the behind the door panels. The district court agreed that the scope of a consent search extends to "any area where the object of the search may be," and that because Andrews pulled back the paneling in a "minimally intrusive manner," his search of the minivan was reasonable.

-8-

We agree. In <u>United States v. Ferrer-Montoya</u>, we held that when a defendant gives his consent to search a vehicle, officers may "search containers within that car which might bear drugs, probe underneath the vehicle, and open compartments that appear to be false, or puncture such compartments in a minimally intrusive manner." 483 F.3d 565, 568 (8th Cir. 2007) (per curiam) (citations omitted). Though Braiske initially only consented to a "real quick" search of the minivan, he then clarified his answer by telling Andrews that, "yes," he could "go ahead" and search the minivan. As we held in <u>Ferrer-Montoya</u>, we conclude that a "typical reasonable person" would have understood Andrews to be asking to search the entire minivan for drugs, including behind the door's interior panels, and that Braiske's answer authorized such a search. Because Andrews and his colleagues opened those panels in a minimally intrusive manner and because Braiske at no time objected or attempted to withdraw his consent, we conclude that the district court did not clearly err in finding that the officers' search of the minivan did not exceed the scope of Braiske's consent.

IV.

Finally, Mayo asserts that Braiske's consent was involuntary and that trooper Andrews's detention was unreasonable. In response, the government argues that Mayo waived these arguments in his plea agreement. According to the plea agreement, the parties agreed that "the only issue reserved for appeal is the issue raised in the defendant's motion to suppress, filed November 24, 2009, at Docket 30." Mayo's motion to suppress incorporated by reference the arguments in Braiske's motion to suppress—that the officers' search exceeded the scope of Braiske's consent and that they denied Braiske an opportunity to withdraw his consent. Mayo argued in addition that he had "standing as a passenger to assert his [F]ourth and Fifth Amendment Rights." Prior to this appeal, however, nowhere did Mayo argue that Braiske's consent was involuntary or that Andrews's thirty minute detention was unreasonable. In his reply brief, Mayo argues only that "[t]he language utilized in the plea form was, in

hindsight, awkward," but that it was always "clear to all parties" that Mayo "intended to appeal" these issues.

We agree with the government that Mayo waived these issues by failing to include them in his motion to suppress. See, e.g., United States v. McCarty, 612 F.3d 1020, 1026 (8th Cir. 2010) ("McCarty failed to raise these claims in his motion to suppress, and thus they were waived under the terms of the plea agreement."). Moreover, it was not plain error for the district court not to sua sponte suppress the evidence on the grounds Mayo now asserts. See, e.g., United States v. Lopez-Mendoza, 601 F.3d 861, 866–67 (8th Cir. 2010) (officer reasonably believed defendant consented to a car search on similar facts); Sanchez, 417 F.3d at 975 (forty five minute detention not unreasonable when a majority of the encounter was spent completing the traffic stop, and any delay stemmed from the defendant's having provided insufficient documentation of license and registration).

V.

For these reasons the judgment of the district court is affirmed.

_____