# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-1340

_____

United States of America

*Plaintiff - Appellee*

v.

Susana Guevara

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: June 26, 2013
Filed: October 3, 2013

_____

Before RILEY, Chief Judge, MELLOY and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Susana Guevara ("Guevara") appeals her conviction for possession of methamphetamine with intent to distribute. Guevara consented to a search of her vehicle during a routine traffic stop. The search exposed a hidden compartment in

the engine that contained methamphetamine.  The district court[1] denied defendant's motion to suppress.  We affirm.

## I. Background

On May 11, 2011, Susana Guevara was stopped by Trooper Russell Lewis of the Nebraska State Patrol.  Guevara was driving a 1996 Jeep Cherokee eastbound in the left lane of I-80 going sixty-eight miles per hour in a seventy-five mile-per-hour zone.  Trooper Lewis first noticed the Jeep slowly passing a semi because a line of cars had built up behind the Jeep.  When the Jeep finally passed the semi, the Jeep did not move over to the right lane.  Instead, the Jeep continued in the left lane for another five miles, forcing cars behind it to pass on the right.  Trooper Lewis followed the Jeep and attempted to signal the Jeep to move over to the right lane. Eventually, Trooper Lewis stopped the Jeep.

Trooper Lewis told Guevara that he pulled her over because she was "impeding traffic."  He said that she could stay in the left lane to pass, but that she then needed to get over to the right lane to allow faster moving cars to pass as well.  Trooper Lewis asked Guevara to accompany him back to his car.  While processing Guevara's information, Trooper Lewis asked Guevara where she was headed.  Guevara stated she was going to Minneapolis to visit her aunt.  Guevara was not sure where her aunt lived but said she had written it down on a piece of paper in her car.  Guevara later suggested that she needed to call her aunt for the information but had not yet been able to reach her.  Trooper Lewis testified that he knew it was common for drug smugglers to know the city, but not the specific address, of their destination.  Trooper Lewis also asked if she owned the Jeep, and Guevara said no.  Guevara said a friend

---

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska, adopting the report and recommendation of the Honorable F.A. Gossett, United States Magistrate Judge for the District of Nebraska.

had helped her borrow the vehicle from its owner, whom Guevara did not know very well. Trooper Lewis noted that the vehicle had an open title, meaning the owner of the vehicle had signed the seller's portion of the title but had left the buyer's portion blank. Trooper Lewis testified that he knew from his experience that smugglers will often use a third-party vehicle or a vehicle with an open title.

Trooper Lewis left Guevara in his car and went to talk to the passenger of the Jeep, Guevara's sister. Trooper Lewis asked the passenger for her identification. While running the passenger's information, Trooper Lewis asked Guevara for her consent to search the Jeep. He told her that because she was the driver of the vehicle and in possession of the vehicle, she could consent to the search. Guevara asked if she had to consent, and Trooper Lewis said she did not. He asked again whether Guevara would consent to a search, and she ultimately consented. Trooper Lewis then asked for the passenger's consent. The passenger limited her consent to a search of her luggage.

Trooper Lewis radioed for assistance with his search but started to conduct his search alone, with Guevara's passenger still in the passenger seat. Trooper Lewis began by searching the passenger cabin and the luggage. At one point, Trooper Lewis returned to his squad car, and Guevara objected to the search of her luggage. Trooper Lewis informed her that he had already opened her luggage and that he had not disturbed the contents. Shortly thereafter, Trooper Pelster arrived to assist Trooper Lewis. Trooper Pelster moved Guevara's passenger from the passenger seat of the Jeep to his squad car. When Trooper Pelster later engaged the passenger in conversation, he noted that the sisters gave inconsistent stories regarding whom they were going to visit. Guevara stated they were going to see their aunt, while Guevara's sister stated they were going to see their mother. When asked, Guevara said her mother lived in California, not in Minnesota.

-3-

After searching the passenger cabin and underside of the car, the troopers began to search the engine compartment. The troopers testified that, on this type of vehicle, the air intake manifold was one spot where smugglers commonly build a compartment. The troopers found that the engine was very clean for such an old vehicle, and they noticed what they thought could be evidence of tampering. In particular, it appeared that the air intake manifold bolts were "tooled," showing wear from being opened and put back together. They also noticed fingerprints and smudge marks that suggested someone had handled or touched the area. Trooper Lewis got a wrench and removed the bolt securing the air intake manifold cover; this cover, or hose, came off very easily. Trooper Lewis inserted the wrench through a hole in the manifold to check for a hidden compartment. The wrench went in about two inches and abruptly struck a piece of metal. In an unmodified vehicle, the wrench should have gone in six to eight inches. Peering into the hole, the troopers noticed that the inside had been painted black. The troopers could see scratches in the paint from the wrench and paint flakes on the wrench.

Trooper Lewis then drilled a small hole in the metal of the compartment. Through the hole, the troopers could see the compartment contained cardboard. They enlarged the hole to about the size of a dime, which revealed cardboard and plastic. Seeing something inside the compartment, the troopers decided to detain the women and move the car to a mechanic's garage where the engine could be disassembled. Trooper Pelster told Guevara's passenger, who was in his squad car, that she was being detained. Meanwhile, Trooper Lewis told Guevara she was under arrest. Before significant time had passed, the troopers realized they had given the women inconsistent information. After discussing the matter with Trooper Pelster, Trooper Lewis informed Guevara that she was not under arrest but was simply being detained while the Jeep was towed to a garage. At the garage, methamphetamine was found inside the hidden compartment.

Susana Guevara and her sister were transported to the Nebraska State Patrol office, where Guevara made incriminating statements. In her motion to suppress, Guevara challenged the constitutionality of the traffic stop, the destructive search of her vehicle, her subsequent detention, and the use of her statements at trial. The district court adopted the magistrate judge's report and recommendation with little modification and denied the motion to suppress.

## II. Discussion

We review the district court's findings of fact for clear error and review its legal conclusions about whether the search or seizure violated the Fourth Amendment *de novo*. United States v. Olivera–Mendez, 484 F.3d 505, 509 (8th Cir. 2007) (citing Ornelas v. United States, 517 U.S. 690, 698–99 (1996); United States v. Sanchez, 417 F.3d 971, 974 (8th Cir. 2005)).

## A. The Traffic Stop

First, Guevara challenges the constitutionality of the traffic stop. A traffic stop is considered a seizure for Fourth Amendment purposes. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)). In order to justify the seizure, the stop must be "supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006).

In this case, the district court found that Trooper Lewis had a reasonable suspicion that a traffic violation had occurred at the time he stopped the vehicle. United States v. Guevara, No. 11-00135, 2012 WL 553356, at *3 (D. Neb. Feb. 21, 2012). The district court found that "[a]ll that was required in this case was a reasonable suspicion that some traffic violation occurred." Id. The court held that the trooper did not need to be correct that a law had been broken, or even correct

about which law had been broken, provided his "mistake in law or fact" was "objectively reasonable." Id. (quotation omitted).

The district court suggested that if Trooper Lewis did make a mistake in using the phrase "impeding traffic," it was an objectively reasonable one. Id. The court found that "Trooper Lewis did not testify to a specific statute as the basis for the traffic stop, and he is not required to do so." Id. The district court noted that Trooper Lewis "clearly described conduct prohibited by the '[d]riving on the right half of roadway required' statute, § 60–6,131."[2] Id. The district court ultimately concluded that "Trooper Lewis had an objectively reasonable belief that a traffic violation had occurred, and a reasonable suspicion to stop the Jeep." Id.

Guevara argues that the district court's opinion relied on a different statute than the one Trooper Lewis cited to Guevara when he pulled her over. Even if that were true, it does not necessarily answer the question of whether Trooper Lewis had the probable cause or reasonable suspicion necessary to make the stop. "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (citing Whren v. United States, 517 U.S. 806, 812–13 (1996)). "That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." Id. The record shows that Trooper Lewis observed Guevara driving in the left lane and failing to move over to the right lane for faster moving cars. Trooper Lewis even told Guevara that she could not simply drive slowly in the left lane, forcing cars to pass her on the right. Under Devenpeck and Whren, Trooper Lewis had the probable cause necessary to make the traffic stop for

---

[2]Neb. Rev. Stat. § 60–6,131(2) ("Driving on right half of roadway required; exceptions"), which provides: "(2) Upon all roadways, any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane . . . except when overtaking and passing another vehicle . . . ."

improperly driving in the left lane, a reason he did articulate to Guevara at the time of the stop.

## B. Standing

Second, Guevara challenges the district court's finding that she lacks standing to challenge the search of the vehicle. For purposes of this opinion, we will assume, without deciding, that she has standing to challenge the search of the vehicle.

## C. Consent to the Search of the Vehicle

The district court found that Guevara voluntarily consented to the search of the Jeep. On appeal, Guevara does not contest that she initially consented to the search. Instead, Guevara argues that her consent was invalidated, or not voluntary, because she was deprived of an opportunity to withdraw or limit her consent by being placed in the trooper's car during the search.

A warrantless search of an automobile for contraband is allowed under the Fourth Amendment if an officer has probable cause to justify the search. See generally United States v. Ross, 456 U.S. 798 (1982) (discussing an automobile exception, which permits a warrantless search of a vehicle based on probable cause); Carroll v. United States, 267 U.S. 132 (1925) (finding an automobile exception). Even without probable cause, if an officer has obtained voluntary consent to search, then the officer is free to search the vehicle provided the search stays within the scope of the consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").

We have not, to date, found that officers have a duty to ensure that an individual has an opportunity to withdraw or limit consent. See, e.g., United States v. Gallardo, 495 F.3d 982, 990 (8th Cir. 2007) (noting the lack of authority supporting the proposition that officers have a duty to allow an opportunity to withdraw or limit consent). Even assuming officers do have a duty to allow such an opportunity, however, the evidence supports the finding that Guevara failed to make an effort to withdraw or limit her consent in a timely manner. See id. (finding a person is "at least obligated to make some effort to communicate an intent to withdraw his consent" before a court will entertain a claim of lack of opportunity to withdraw consent); see also United States v. Braiske, No. 09-0073, 2010 WL 299482, at *4 (N.D. Iowa Jan. 21, 2010), aff'd sub nom. United States v. Mayo, 627 F.3d 709 (8th Cir. 2010) (noting that defendant was in a position to communicate with officers and never attempted to do so).

As Guevara points out, she did object to the search of her luggage, thus demonstrating that she knew how to limit her consent and was capable of doing so. Guevara maintains, however, that she later knocked on the window in order to speak with Trooper Lewis and to object to the search of the engine compartment. The squad car video of the traffic stop shows Guevara's hand briefly moving in front of the camera toward the front windshield. The video does not make clear exactly what she is doing, but Guevara asserts this was a knock. What the record lacks, however, is any additional evidence to support the conclusion that (1) Guevara was knocking in an attempt to get the troopers' attention;[3] or (2) Guevara's purpose for getting the troopers' attention was to withdraw or limit her consent. The district court found that "[Guevara] did not object during the search," and that "[t]he evidence does not show

_____

[3]In contrast to Guevara's assertion, Trooper Lewis testified that Guevara had not tried to get his attention "by hitting the window" after he retrieved a drill from his squad car. Given the video from the squad car, it does appear that Guevara made some movement with her hand at one point when Trooper Lewis walked by. We have found nothing more in the record to help reconcile this discrepancy.

that [Guevara] revoked her consent, or that she limited the scope of her consent, at any time before or during the search." Guevara, 2012 WL 553356, at *6. Given the state of the record, we cannot say the district court's finding that Guevara made no effort to withdraw her consent is clearly erroneous.

Even if we could find that Guevara was knocking, and that she was knocking in an effort to withdraw or limit her consent, the record shows the knock came too late. According to the squad car video, the troopers discovered the hidden compartment at least five or six minutes before Guevara claims to have knocked. The district court found that probable cause to conduct the destructive search existed from the point the troopers discovered the hidden compartment. Guevara, 2012 WL 553356, at *6 n.10, *7. As discussed below, we agree. Because the troopers no longer needed Guevara's consent to continue the search once they discovered the compartment, any effort to withdraw or limit her consent at that point would have been fruitless.

**D. Destructive Search of the Engine**

Next, Guevara argues the troopers lacked the probable cause necessary for a destructive search of the engine. "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." Florida v. Harris, 133 S. Ct. 1050, 1055 (2013) (internal quotation and alterations omitted). It is a "practical and common-sensical standard" based on "the totality of the circumstances." Id. "All [that is] required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act." Id. (internal quotations and alterations omitted). Particularly with respect to automobile searches:

> [A] police officer may draw inferences based on his own experience in deciding whether probable cause exists. See, e.g., United States v.

Ortiz, 422 U.S. 891, 897 (1975). To a layman the sort of loose panel below the back seat armrest in the automobile involved in this case may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel. An appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable.

Ornelas v. United States, 517 U.S. 690, 700 (1996). "Consensual searches generally cannot be destructive." United States v. Santana–Aguirre, 537 F.3d 929, 932 (8th Cir. 2008) (citing United States v. Alverez, 235 F.3d 1086, 1088–89 (8th Cir. 2000)). "Cutting or destroying an object during a search requires either explicit consent for the destructive search or articulable suspicion that supports a finding that probable cause exists to do the destructive search." Id.

The district court held that once the troopers discovered the hidden compartment, they had probable cause to search the vehicle in a destructive way. We agree. After finding the compartment, the troopers had more than enough information such that a reasonable person, particularly with their training and experience, would believe there was a "fair probability" that drugs were hidden in the engine compartment. First, Guevara and her sister gave inconsistent answers about which relative they were going to visit, and neither of them knew the address of their final destination. The vehicle also had an open title and had been loaned to them by a third party for the trip. Second, the troopers noticed the engine compartment was particularly clean, with visible evidence that someone had touched or handled the area. Bolts in the area of the air intake manifold looked "tooled," and the hose covering the air intake manifold came off very easily, suggesting it had been on and off several times or had not been replaced properly. Finally, the location of the hidden compartment in the air intake manifold was, in the experience of the officers, typical of drug smuggling in a vehicle of this type. Hr'g Tr. Mot. to Suppress at 23, No. 11-00135, ECF No. 54. Upon finding a hidden compartment in the engine, the

troopers had more than a suspicion that the Jeep was being used for smuggling. Based on the totality of the circumstances, they had a reasonable belief they would find drugs in the compartment. See Harris, 133 S. Ct. at 1055. Therefore, we affirm the district court's finding that after the troopers discovered the hidden compartment, they had probable cause to continue the search. See Alverez, 235 F.3d at 1088–89 (finding a destructive search of a vehicle is allowed where officers have probable cause).

### E. Whether Guevara was Arrested

Finally, Guevara contends that she was placed under arrest by Trooper Lewis at a time when the troopers merely suspected she possessed contraband but lacked probable cause. "There is no bright line of demarcation between investigative stops and arrests." United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992) (citing United States v. Sharpe, 470 U.S. 675, 685–86 (1985)) (additional citations omitted). "'A Terry stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if officers use unreasonable force.'" United States v. Smith, 648 F.3d 654, 660 (8th Cir. 2011) (quoting United States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010)). Guevara contends that she was in fact under arrest at least from the time she was handcuffed, which is before she gave incriminating statements. The district court accepted the magistrate judge's finding that Guevara was merely detained and not arrested.

This is not the case to wrestle with the boundaries of detentions and arrests. While the circumstances of this case suggest something more than an investigative detention, we find there was probable cause to support an arrest. Thus, "any arrest that might have allegedly occurred was not unlawful." United States v. Martinez, 462 F.3d 903, 907, 910 (8th Cir. 2006) (finding in the alternative that even if a detention was converted into an arrest by handcuffing the suspect, because there was probable

-11-

cause, the arrest was not unlawful). We will assume without deciding, therefore, that Guevara's detention was an arrest.

Guevara argues that the discovery of a hidden compartment containing cardboard and plastic was insufficient to give the troopers probable cause to arrest. Guevara maintains that because the troopers did not know with any degree of certainty that there were drugs hidden in the compartment, they lacked probable cause to arrest her. We disagree.

Whether officers make a formal arrest or a detention ripens into an arrest, "[a] warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause." Ulrich v. Pope Cnty., 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting Borgman v. Kedley, 646 F.3d 518, 522–23 (8th Cir. 2011)); see also Martinez, 462 F.3d at 907, 910 (holding in the alternative that even if handcuffing a suspect did convert the detention into an arrest, the arrest was justified by probable cause). "Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" Ulrich, 715 F.3d at 1059 (quoting Borgman, 646 F.3d at 523).

Guevara points to United States v. Tovar–Valdivia, 193 F.3d 1025 (8th Cir. 1999), and United States v. Jones, 254 F.3d 692 (8th Cir. 2001), which held that the mere observation of a non-anatomical bulge on someone's person was, without additional information, insufficient to provide probable cause that contraband would be found in the bulge. Guevara argues that a hidden compartment, the contents of which are unknown, is logically indistinguishable from a non-anatomical bulge.

Tovar and Jones are distinguishable from the present case in two important respects. First, there is a significant difference between searching a person and searching a vehicle. The court in Tovar stressed that the bulge might contain

-12-

anything—there were many conceivable and likely legal possibilities. "The bulges could have been bandages about his body, a money belt worn about his ribs, or any number of non-contraband items." Tovar, 193 F.3d at 1028. In contrast, we think a hidden compartment in a car, particularly one hidden inside an engine, is far less likely to contain non-contraband or have a non-illegal purpose than a miscellaneous bulge in someone's clothing. Thus, the location and nature of the compartment, irrespective of the drilling or opening of the compartment, provide some clue about its contents.

Second, in other concealed bulge cases, we have upheld a finding of probable cause where the officer had additional information about what was in the bulge. See United States v. Aquino, 674 F.3d 918, 924–25 (8th Cir. 2012) (discussing concealed bulge cases and noting a difference where the touching of the bulge leads to a belief about what is inside the bulge); see also United States v. Favela, 247 F.3d 838, 839 (8th Cir. 2001). We have found that an officer does not have to actually see the contraband inside the bulge. Aquino, 674 F.3d at 924–25. Instead, the officer has to form a reasonable belief about what is in the bulge, based on something other than simply observing the exterior of the bulge. Id. In the bulge cases, the officer may achieve this through a permissible touching of the bulge; if the officer believes she feels drugs or a weapon, the officer may have probable cause to arrest. Id.

Applying the rule from Aquino, the troopers formed a belief about the contents of the hidden compartment based on something other than observing the exterior of the compartment. Drilling into the compartment provided the additional information necessary to buttress the troopers' initial observations.[4] After looking into the compartment and seeing something other than metal, particularly cardboard and

---

[4]We can hardly fault the troopers for failing to engage in a far more destructive search of the compartment on the side of a busy highway, nor do we think that additional searching was necessary.

plastic, a prudent person would believe the compartment contained contraband and an offense was being committed. Thus, the troopers had probable cause to justify an arrest once it was clear that the engine compartment was not empty and the holes were drilled into the compartment.[5] As an arrest, the officers were permitted to handcuff Guevara and transport her to the mechanic's garage in the police car. Because Guevara was read her Miranda rights, any statements she made at the garage or later at the Nebraska State Patrol office are admissible.[6]

### III. Conclusion

For the reasons stated above, we affirm the district court.

_____

---

[5]Guevara alleges that her arrest began when she was handcuffed and transported to the mechanic's garage. These events occurred after the troopers drilled into the compartment. We reserve judgment on whether there was probable cause to arrest at the time the compartment was discovered—i.e., before the arrest is alleged to have occurred.

[6]Even if the detention did not become an arrest, and Guevara was merely in custody, the Miranda warnings given by Trooper Lewis shortly after handcuffing her would still save her statements from suppression. See Martinez, 462 F.3d at 907–10 (discussing the characteristics of a custodial detention and interrogation, which also requires Miranda warnings).

-14-