# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-3086

_____

United States of America

*Plaintiff – Appellee*

v.

Paul Beckmann

*Defendant – Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 13, 2015
Filed: May 15, 2015
[Published]

_____

Before MURPHY and SHEPHERD, Circuit Judges, and HARPOOL,[1] District
Judge.

_____

HARPOOL, District Judge.

---

[1]The Honorable M. Douglas Harpool, United States District Judge for the
Western District of Missouri, sitting by designation.

Paul Beckmann pled guilty to one count of possession of child pornography after having been previously convicted and sentenced for possession of child pornography in 2001. See 18 U.S.C. § 2252A(a)(5)(B), (b)(2). The district court[2] sentenced Beckmann to 120 months of imprisonment, a lifetime of supervised release, and ordered him to pay $9,000 of restitution. On appeal, Beckmann asserts that the district court erred by: (1) denying his motion to suppress evidence found on an external hard drive as the result of an illegal search under the Fourth Amendment; (2) denying his motion to suppress evidence as the result of an intentional and deliberate violation of Rule 41; and (3) ordering restitution in the amount of $9,000. We affirm.

I.

Since Beckmann's conviction for possession of child pornography in 2001, Beckmann has been required to register as a sex offender. On August 2, 2011, as part of a routine sex offender verification through the United States Marshal's Office, Jefferson County Deputies Barbato and Thebeau visited Beckmann's home. The purpose of the visit was to verify Beckmann's address and to ensure that he was complying with any conditions related to his status as a sex offender.

Upon arrival, the deputies knocked on Beckmann's door, told him they were there for sex offender verification and asked to enter his home. Beckmann consented. Once inside, the deputies observed a laptop computer on the coffee table. Beckmann informed the officers that he was under no supervised release conditions and that he was lawfully allowed to have a computer and internet access. Deputy Barbato asked to look through the contents of Beckmann's laptop in order to "make sure he was not accessing any content he's not supposed to be

---

[2] The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

accessing." Beckmann consented. While Deputy Barbato searched the laptop, Beckmann showed Deputy Thebeau around the rest of the residence. Deputy Thebeau alerted Deputy Barbato that there was another computer in the upstairs office. He then obtained permission to use the upstairs restroom. Deputy Barbato proceeded upstairs partially for safety reasons and partially because he wanted to make sure Defendant was not "going through anything he shouldn't be."

When Deputy Barbato arrived upstairs and looked into the office where Beckmann went, he saw a computer desk with a monitor on it and Beckmann underneath messing with wires/cords. To alert Beckmann to his presence, Deputy Barbato asked Beckmann if this was the "other" computer. Beckmann seemed startled and responded yes. Deputy Barbato then asked if he could take a look at that computer, as well. Beckmann consented.

Deputy Barbato sat down and observed one computer tower and two external hard drives underneath the desk. Both of the external hard drives were connected to the tower but the power cord to one of them was unplugged from the wall. Deputy Barbato believed that these were the cords Beckmann was manipulating, and he believed that Beckmann had been trying to shut off the computer. The deputy plugged the power cord to the unplugged external hard drive back into the wall and began to search the computer, including the external hard drives. By this time, Beckmann had exited the office. The deputy admitted that he did not get specific consent to search the external hard drives nor did he get consent to plug the one external hard drive back into the wall; however, he considered the external drives to be a part of the "computer" because they were plugged into the computer. During his search, Deputy Barbato discovered file names suggesting child pornography. The deputy asked Beckmann about the suspicious files and Beckmann stated that he did not wish to answer. The officers then placed Beckmann into investigative detention. After speaking with his

-3-

attorney, Beckmann signed a consent form allowing the officers to seize the laptop, computer, and external hard drives pending application for a search warrant.

The government obtained a search warrant on August 15, 2011 to copy and search the property seized. The warrant specified that it was to be executed on or before August 29, 2011. "Execution" of the search warrant required a forensic analyst to copy and search existing and deleted computer files. The investigator began analyzing the seized computers in November of 2011 and the external hard drives on January 24, 2012. The analyst located over 2,000 images of child pornography on the external hard drive. On April 25, 2012, a report was prepared documenting what was found on the computer media. A return of inventory was filed with the district court on November 15, 2013. The sergeant handling the case stated that he did not intend to prejudice Beckmann or delay the proceedings but merely forgot to return the warrant.

On July 24, 2013, the grand jury returned a one-count indictment against Beckmann for possession of child pornography. Beckmann filed a motion to suppress certain evidence and statements. The magistrate judge held two evidentiary hearings on Beckmann's motion before issuing a report and recommendation. Beckmann filed objections to the report and recommendation, and the district judge reviewed the issues de novo. The district judge sustained, adopted, and incorporated the magistrate's report and recommendation with the exception of two factual findings. The district court granted Beckmann's motion to suppress certain statements made by Beckmann but denied the motion as to other statements and the physical evidence. Beckmann elected not to proceed to trial and instead entered a plea of guilty, reserving his right to appeal the order on his motion to suppress.

Prior to sentencing, the parties submitted memoranda concerning the appropriate amount of restitution to be ordered. The government submitted victim

impact statements from three of the victims of child pornography – Cindy, L.S., and Vicky. Beckmann possessed three images of Cindy, ten images of L.S., and fourteen videos and two images of Vicky. During sentencing, the government requested $3,000 of restitution per victim based on the mean amount of restitution ordered in the recent Supreme Court case of United States v. Paroline and citing two other district court opinions. The government further offered a computation of restitution based on the average number of former and expected claims per victim and the average amount of loss attributable to each defendant over a twenty year period. These calculations yielded the following restitution amounts: Cindy - $1,600, L.S. - $2,400, and Vicky - $675. Beckmann argued that the government failed to make the causal link required by Paroline in order to justify such significant restitution. Even if it could, Beckmann argued, the range of $200-$300 would be more appropriate because Beckmann was a mere possessor.

The district court held that Beckmann's mere possession of child pornography was a proximate cause of the victims' losses because Beckmann contributed to "ongoing victimization" and "ongoing victimization causes ongoing harm." The court further held that the government met its burden to show an appropriate amount of restitution based on the limited information available. The court noted that Paroline cautions against a formal mathematical formula and ultimately ordered $3,000 of restitution per victim, finding the amount reasonable in light of prior restitution orders, the number of potential defendants involved, and Beckmann's relative culpability.

II.

Beckmann first argues that the district court erred by denying his motion to suppress the incriminating evidence found on his external hard drive as the fruit of an illegal search under the Fourth Amendment. "When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error

and its legal conclusions de novo." United States v. Anderson, 688 F.3d 339, 343 (8th Cir. 2012). We will affirm the denial of a motion to suppress unless we find that the district court's decision "is unsupported by the evidence, based on an erroneous view of the law, or the Court is left with a firm conviction that a mistake has been made." United States v. Riley, 684 F.3d 758, 762 (8th Cir. 2012) (citations omitted).

The district court found that Beckmann gave the officers consent to search his computer.[3] Consensual searches are reasonable under the Fourth Amendment. Florida v. Jimeno, 500 U.S. 248, 250-51 (1991). The standard for measuring the scope of a person's consent is "objective reasonableness," which asks what the typical, reasonable person would have understood from the exchange between the officer and the suspect. Id. at 251. While the voluntariness of a defendant's consent to search is a question of fact that is reviewed for clear error, United States v. Quintero, 648 F.3d 660, 665 (8th Cir. 2011), the reasonableness of an officer's reliance on such consent is a question of law that is reviewed de novo. United States v. James, 353 F.3d 606, 615 (8th Cir. 2003).

Here, Beckmann argues that it was unreasonable for Deputy Barbato to rely on Beckmann's consent to search the computer in order to justify his search of the external hard drive. The scope of a consensual search is "generally defined by its expressed object." Jimeno, 500 U.S. at 251. For example, where an officer asks to search a car for suspected narcotics, and the occupant agrees without explicit limitation on the scope of the search, the officer may search the entire car including containers therein that may hold narcotics. Id. If the consent "would reasonably be understood to extend to a particular container" then "the Fourth Amendment

---

[3] Beckmann denies that he consented to the search of the upstairs computer; however, the magistrate judge and district judge made clear and explicit factual findings that show Beckmann did consent to the search. Suppression Order 4-6; Report & Recommendation ¶ 16. Beckmann does not argue these findings are clearly erroneous.

provides no grounds for requiring a more explicit authorization." Id. at 252. Reasonableness is measured in objective terms based on the totality of the circumstances. Ohio v. Robinette, 519 U.S. 33, 39 (1996). Where a person is present and fails to object to the continuation of a search, courts consider such circumstantial evidence to provide proof that the search conducted was within the scope of consent. See United States v. Lopez-Mendoza, 601 F.3d 861, 868 (8th Cir. 2010).

Applying these standards, Deputy Barbato's belief that consent to search the computer included consent to search the connected but unplugged external hard drive was not objectively unreasonable. Deputy Barbato testified that he believed he had consent to search the external hard drive based on his understanding of the word "computer" and the fact that the external drive was attached to the computer tower. The deputy's belief is not objectively unreasonable in light of the common understanding that the term "computer" encompasses the collection of component parts involved in a computer's operation. See, e.g., United States v. Herndon, 501 F.3d 683, 690 (6th Cir. 2007). Beckmann did not explicitly limit the scope of his consent to search the computer, nor did he object when Deputy Barbato plugged the external hard drive into the electrical outlet and began searching.[4] Based on the

---

[4] Beckmann argues that he was not in the room at the time Deputy Barbato plugged the external hard drive into the wall in order to have had the opportunity to withdraw or limit his consent. The magistrate judge stated:

> After he plugged in the power cord, Deputy Barbato got up and sat in the chair at the desk. He then used the computer mouse with the monitor to activate the computer. Barbato thought the computer desktop displayed on the monitor looked normal, although it had icons he was unfamiliar with. By this time Beckmann had walked out of the room.

Report & Recommendation ¶ 18. Even assuming Beckmann was not present in the room at the time Deputy Barbato plugged the external hard drive's power cord into

-7-

totality of the circumstances presented here, Deputy Barbato had an objectively reasonable basis to conclude that Beckmann consented to the search of the external hard drive.

Beckmann argues Deputy Barbato's belief was unreasonable because an external hard drive cannot reasonably be interpreted to constitute a "component part involved in the computer's operation." He argues that merely plugging a device into a computer does not render the device a part of the computer's operation, and he analogizes an external hard drive to a cellular telephone. He warns that the district court's order sets "dangerous precedent for law enforcement to be able to search anything and everything that can be plugged into a computer[.]" We disagree. First and foremost, the scope of the consent to search here, as in all cases, is based on the totality of the circumstances including the interaction between the parties, the purpose of the search, and the circumstantial evidence surrounding the search. Second, a typical, reasonable person is more likely to consider a connected external hard drive a "component part involved in a computer's operation" as compared to a connected cellular telephone. Unlike a cellular telephone, the sole purpose of an external hard drive is to store computer data. Additionally, external hard drives, unlike cellular telephones, are functionally inoperable – and their contents unreviewable – when unplugged from a computer. Thus, Deputy Barbato's belief that the attached external hard drive constituted a "component part involved in the computer's operation" was not objectively unreasonable.

Beckmann also argues that Deputy Barbato's belief was unreasonable because the deputy witnessed Beckmann attempt to unplug the external hard drive from its power source, which effectively limited the scope of the consent. The

_____

the wall, "[w]e have not, to date, found that officers have a duty to ensure that an individual has an opportunity to withdraw or limit consent." United States v. Guevara, 731 F.3d 824, 829 (8th Cir. 2013).

Court finds Beckmann's argument unpersuasive. Beckmann provided explicit, unlimited consent to search his computer after the deputy witnessed him manipulating wires under the desk. Beckmann could have denied consent to search the upstairs computer or limited the scope of the consent, but he did not. The evidence demonstrates that Beckmann knew how to limit his consent, and did so during other situations that day,[5] but he did not do so in this instance. Where a suspect provides general consent to search, only an act clearly inconsistent with the search, an unambiguous statement, or a combination of both will limit the consent. See United States v. Lopez-Mendoza, 601 F.3d 861, 867 (8th Cir. 2010). A subtle indication that a suspect wishes to limit the scope of a search is insufficient to render the search unreasonable. See, e.g., United States v. Siwek, 453 F.3d 1079, 1086 (8th Cir. 2006) (suspect's statement that he lacked key to tonneau cover did not amount to denial of consent); United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004) (suspect's statements that length of search was "ridiculous" and he was "ready to go now" did not amount to withdraw of consent). Here, Beckmann provided general consent to search his computer and he did not object when Deputy Barbato plugged the external hard drive into the wall and began searching it. These facts support the conclusion that the search conducted was within the scope of Beckmann's consent.

Based on the foregoing, the district court did not err in finding the search of the external hard drive reasonable and denying Beckmann's motion to suppress the evidence derived therefrom.

---

[5] After being placed into investigative detention, Beckmann advised that he would answer some questions and not others and he agreed to give certain permissions and not others. For example, he agreed to answer questions about his computer but refused to answer any questions about downloading child pornography. He also refused to allow the computer forensic analyst to verify the titles of the files discovered.

## III.

Beckmann next challenges the district court's denial of his motion to suppress certain physical evidence pursuant to Federal Rule of Criminal Procedure 41. Rule 41 states, in part, that a "warrant must command the officer to . . . execute the warrant within a specified time no longer than 14 days" and the "officer executing the warrant must promptly return it[.]" Fed. R. Crim. P. 41(e)(2)(A)(i), (f)(1)(D). Beckmann argues that the government failed to satisfy the requirements of Rule 41 because there was a two- to five-month delay in executing the warrant and a two-year delay in filing the return of inventory. The district court found that the government violated Rule 41 but suppression was improper.

When the government violates Rule 41, the Court may exclude the evidence described in the search warrant only "if the defendant is prejudiced or if reckless disregard of proper procedure is evident." United States v. Mutschelknaus, 592 F.3d 826, 829 (8th Cir. 2010); see United States v. Freeman, 897 F.2d 346, 349 (8th Cir. 1990). Beckmann argues that the officers here exhibited a reckless disregard for proper procedure in light of the length of the delays, the government's failure to seek additional time from the court either before or after issuance of the warrant, and the deputy's testimony that these searches are rarely completed prior to the prescribed deadline. Beckmann argues that he was further prejudiced by the delay because he was without his computers containing personal information for over two years. He further argues that he was deprived a speedy resolution to the investigation and the delay allowed witnesses' memories to become stale.

Upon review, the Court need not decide whether the government violated Rule 41 because there was neither prejudice nor reckless disregard sufficient to justify suppression of the physical evidence seized from Beckmann. Even

assuming the government failed to comply with the due date of execution stated in the search warrant,[6] and further assuming that such a delay constitutes a violation of Rule 41,[7] the government did not exhibit reckless disregard for proper procedure in light of the length of time typically required to conduct computer analyses in child pornography case, see United States v. Mutschelknaus, 592 F.3d 826, 830 (8th Cir. 2010) (quoting United States v. Syphers, 426 F.3d 461, 469 (1st Cir. 2005) (collecting cases)), and Beckmann suffered no prejudice because probable cause continued to exist and the evidence did not become stale or deteriorate. See United States v. Gregoire, 638 F.3d 962, 968 (8th Cir. 2011). While best practice would have been for the detectives to file a motion seeking additional time to execute the warrant, their failure to do so here does not warrant suppression.

---

[6] The Court notes that the government has not argued its search was proper under Rule 41(e)(2)(B), which was designed to remedy the type of difficulty the government encountered here. See Fed. R. Crim. P. 41(e)(2)(B) ("Unless otherwise specified, the warrant [seeking electronically stored information] authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant . . . refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review."); Fed. R. Crim. P. 41 advisory committee's note on the 2009 amendments ("This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant. . . . A substantial amount of time can be involved in the forensic imaging and review of information. This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs.").

[7] Rule 41(e)(2)(A)(i) states that "[t]he warrant must command the officer to . . . execute the warrant within a specified time period no longer than 14 days." Here, there is no dispute the warrant complied with the terms of Rule 41 because it was issued on August 15, 2011 and required execution by August 29, 2011. Thus, Beckmann's argument is not that the warrant failed to comply with the Rule, but that the government failed to comply with the warrant.

-11-

Second, as to the government's two-year delay in returning the warrant, the district court made a credibility determination that the detective's delay was due to inadvertence rather than deliberate and intentional disregard for the rules. This Court is not in a position to overturn the district court's credibility determination. United States v. Shafer, 608 F.3d 1056, 1065 (8th Cir. 2010) ("A credibility finding made by a magistrate judge after a hearing on the merits of a motion to suppress is virtually unassailable on appeal." (internal quotations omitted)). Therefore, the Court is unable to find reckless disregard for proper procedure. See United States v. Berry, 113 F.3d 121, 123 (8th Cir. 1997) (analyzing the "reckless disregard" issue as akin to "bad faith"). Moreover, Beckmann does not argue sufficient prejudice to justify exclusion. See United States v. Turner, No. 13-2566, 2015 WL 1222274, at *6 (8th Cir. Mar. 18, 2015) (quoting United States v. Hyten, 5 F.3d 1154, 1157 (8th Cir. 1993) ("To determine prejudice, we ask whether the search would have occurred had the rule been followed. If so, there is no prejudice to the defendant."). Not only would the search have occurred regardless of the officers' delay in returning the warrant, but the arguments furthered by Beckmann concerning prejudice are unconvincing in light of the district court's findings that Beckmann received an initial inventory of the items seized, the witnesses were still available at the time charges were brought, and the witnesses exhibited no recollection problems at the evidentiary hearing. Furthermore, any interference with Beckmann's possessory interest in personal property is curable through means other than suppression. See, e.g., Gregoire, 638 F.3d at 968 (finding suppression not warranted where one-year delay between seizure and search of computer and noting any interference with a possessory interest could have been remedied by Rule 41(g), which the defendant did not invoke).

While we are concerned about the government's failure to comply with the warrant's execution deadline and Rule 41's "prompt" return mandate, exclusion of the evidence is not the proper remedy without showing prejudice or reckless disregard. Here, Beckmann failed to make such a showing. Accordingly, the

district court did not err in denying Beckmann's motion to suppress evidence pursuant to Rule 41.

IV.

Beckmann finally argues that the district court erred in ordering restitution in the amount of $9,000. "District courts routinely exercise wide discretion both in sentencing as a general matter and more specifically in fashioning restitution orders." Paroline v. United States, 134 S. Ct. 1710, 1729 (2014). We review "the district court's decision to award restitution for an abuse of discretion and the district court's finding as to the amount of loss for clear error." United States v. Kay, 717 F.3d 659, 666 (8th Cir. 2013).

Under 18 U.S.C. § 2259(a), a district court shall order restitution for offenses that involve the sexual exploitation of children and child pornography in particular. Paroline, 134 S. Ct. at 1718. Restitution is proper under section 2259 only to the extent that the defendant's offense proximately caused the victim's losses. Id. at 1720, 1722. The Supreme Court held that even mere possessors of child pornography cause proximate harm to victims of child pornography. Id. at 1726. The Court explained that, because child pornography victims suffer "continuing and grievous harm as a result of [knowing] that a large, indeterminate number of individuals have viewed and will in the future view images of the sexual abuse she endured[,]" all persons who reproduce, distribute, or possess child pornography play a part in "sustaining and aggravating this tragedy." Id. The harder question in these cases is determining the appropriate *amount* of restitution – i.e. how much of the victim's losses are attributable to the defendant's conduct.

In 2014, the Supreme Court provided guidance to district courts for determining the appropriate amount of restitution in child pornography cases. Id. at 1727-28. The Court stated that "a court applying § 2259 should order restitution

-13-

in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." Id. at 1727. For example, the amount of restitution would not be "severe" in a case where the defendant was a mere possessor and where all of the victim's losses come from the trade of her images; however, the amount of restitution in that case would also not be "a token or nominal amount." Id. The Court went on to describe, more specifically, how to calculate the appropriate amount of restitution:

> There remains the question of how district courts should go about determining the proper amount of restitution. At a general level of abstraction, a court must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses. This cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment. . . .
>
> There are a variety of factors district courts might consider in determining a proper amount of restitution, and it is neither necessary nor appropriate to prescribe a precise algorithm for determining the proper restitution amount at this point in the law's development. Doing so would unduly constrain the decisionmakers closest to the facts of any given case. But district courts might, as a starting point, determine the amount of the victim's losses caused by the continuing traffic in the victim's images (excluding, of course, any remote losses like the hypothetical car accident described above, see supra, at 1721), then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses. These could include the number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images

-14-

of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role.

These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense. The resulting amount fixed by the court would be deemed the amount of the victim's general losses that were the "proximate result of the offense" for purposes of § 2259, and thus the "full amount" of such losses that should be awarded.

Id. at 1727-28 (internal citations omitted).

In this case, restitution was mandatory under 18 U.S.C. § 2259 and U.S.S.G. § 5E1.1. Beckmann, like Paroline, possessed and did not produce or distribute child pornography. As the Supreme Court stated, mere possessors are still liable for restitution because their actions proximately cause harm to the victim(s). Thus, the district court appropriately found that the government met its burden to prove proximate causation. The district court next found that the government met its burden to prove an appropriate and reasonable amount of restitution based on the victim impact statements, the restitution ordered in prior cases, the number of potential defendants involved, and Beckmann's relative culpability. The district court cited the appropriate law, considered appropriate factors,[8] and ultimately

---

[8] Beckmann argues that the district court erred by failing to take into account all of the factors cited in Paroline and by finding the government's calculation reasonable in lieu of examining the appropriate factors itself. Beckmann's argument is unpersuasive in light of the explicit language in Paroline. See 134 S. Ct. at 1727 ("There are a variety of factors district courts *might* consider in determining a proper amount of restitution, and *it is neither necessary nor appropriate to prescribe a precise algorithm for determining the proper restitution amount at this point in the law's development.*" (emphasis added)). Furthermore, the sentencing transcript reveals that Judge Jackson did, in fact, consider the parties' arguments, the factors discussed in Paroline, and other courts' orders calculating restitution in child pornography cases. See Sentencing Tr. 18:17-22:23.

ordered restitution in the amount of $3,000 per victim, which is an amount consistent with the awards in similar possession cases since <u>Paroline</u>.[9]  Therefore, we cannot conclude that the district court erred in ordering restitution of $9,000, with $3,000 awarded to each victim.

V.

For the foregoing reasons, we affirm the conviction and sentence.

_____

---

[9] <u>See, e.g.</u>, <u>United States v. Rogers</u>, 758 F.3d 37, 39 (1st Cir. 2014) (upholding possessor's restitution of $3,150 to victim who appeared in 9 video clips); <u>United States v. Hagerman</u>, 586 F. App'x 64, 65 (2d Cir. 2014) (affirming restitution of $3,281 for mere possession); <u>United States v. Bellah</u>, No. 13-10169-EFM, 2014 WL 7073287, at *4 (D. Kan. Dec. 12, 2014) (in possession case, awarding $1,500 for victim in 1 image, $1,500 for victim in 3 images, $7,500 for each of five victims within series containing 68 images, and $5,000 for victim in 3 videos and 8 images); <u>United States v. Reynolds</u>, No. CRIM. 12-20843, 2014 WL 4187936, at *7 (E.D. Mich. Aug. 22, 2014) (awarding $8,000 for possession of 16 images of victim, and $14,500 for possession of 19 images of another victim); <u>United States v. Hernandez</u>, No. 2:11-CR-00026-GEB, 2014 WL 2930798, at *10 (E.D. Cal. June 26, 2014) (restitution of $2,282.86 ordered for possessor based on 1 video and unidentified number of images); <u>but see United States v. Cooley</u>, No. 4:14-CR-3041, 2014 WL 5872720, at *3 (D. Neb. Nov. 12, 2014) (awards of $1,910.46, $69.64, $24.24, $18.30, and $184.14).